Donald RYAN, David Ryan, and
Cede & Co., Petitioners,

v.

TAD'S ENTERPRISES, INC., a Delaware
Corporation, Respondent.

Donald RYAN and David
Ryan, Plaintiffs,

v.

TAD'S ENTERPRISES, INC., a Delaware
Corporation, Don Townsend, Neal Town-
send and Bernard Bressler, Defendants.

Civil Action Nos. 10229, 11977.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 13, 1995.
Decided: April 24, 1996.

Robert K. Payson and Arthur L. Dent, Potter, Anderson & Corroon, Wilmington; and Sidney Bender and Risa Bender, of Leventritt, Lewittes & Bender, New York City, for Petitioners and Plaintiffs.

Kenneth J. Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Respondent and Defendants.

JACOBS, Vice Chancellor.

This Opinion decides the merits of two consolidated lawsuits: a statutory appraisal (Civil Action No. 10229) and an individual action claiming breach of fiduciary duties by the board of directors of Tad's Enterprises, Inc. ("Tad's") (Civil Action No. 11977). On May 4, 1988, Tad's sold its restaurant business to the Riese organization (the "Asset Sale"). On May 5, 1988, the following day,

Tad's effected a "cash-out" going-private merger into Tad's Interim Co. ("Newco"), a vehicle formed to carry out that transaction (the "Merger"). Newco was owned by two of Tad's three directors, Donald and Neal Townsend ("the Townsends"), who also were Tad's founders and its controlling shareholders.[1]

The petitioners-plaintiffs, Donald and David Ryan ("the Ryans"), were shareholders of Tad's at the time of the Asset Sale and the Merger. The Ryans dissented from the Merger and commenced an appraisal proceeding pursuant to 8 Del.C. § 262 in September 1988. For several years that case languished. In February 1991, after taking discovery in the appraisal action, the Ryans filed a breach of fiduciary duty and fraud action against Tad's, and the Townsends and Bernard Bressler ("Bressler"), who were its directors at the time of the Asset Sale and Merger.

The appraisal and fiduciary duty actions were consolidated in March 1991. After several lengthy periods of desuetude, the actions were tried during the week of October 3, 1994. This is the post-trial Opinion of the Court in both actions.

## I. FACTS

The facts narrated below are as found by the Court based on a preponderance of the admissible evidence. Other facts are set forth, where relevant, in later sections of this Opinion.

Tad's was a publicly held Delaware corporation that, before the Asset Sale and Merger, was engaged in three businesses. Tad's original business, dating from the mid-1950's, was steak house restaurants. At the time of the Asset Sale, Tad's owned six low-cost steakhouse restaurants, all located in the New York metropolitan area.

---

1. Neal Townsend died after the trial. On November 8, 1995, the defendants filed a Suggestion of the Death of Neal Townsend pursuant to Court of Chancery Rule 25. By stipulation of the parties, Bruce Townsend, the Executor of Neal Townsend's Estate, will be substituted for Neal Townsend as a party defendant in the fiduciary duty action.

Also on February 6, 1996, the plaintiffs moved to supplement the complaint to add a claim that "all or substantially all of [Neal Townsend's] assets had been fraudulently transferred into one or more trust(s)" prior to his death. That motion is denied, as it involves a claim unrelated to those being adjudicated in these actions. That claim is more appropriately the subject of a separate action to enforce the judgment that will be entered in these lawsuits.

In 1983, Tad's diversified into a second line of business, namely, algae production and marketing. That occurred when Tad's purchased an algae production facility in Klamath Lake Falls, Oregon named Cell Tech Incorporated ("Cell Tech"). Cell Tech developed a multi-level marketing system to sell algae products as health food supplements.

In 1984, Tad's diversified into a third business: power production. Tad's started EPG, a business that produced geothermal power. In 1986, EPG used a single electrical generator on a property in Wabuska, Nevada; by 1987, it had installed a second generator to boost production at that facility.

Immediately before the Asset Sale and Merger, the Townsends owned, directly and indirectly, 415,364 shares, or 72.6%, of Tad's outstanding common stock.[2] The plaintiffs owned 31,600 Tad's shares, or 5.5%, of Tad's outstanding common stock.[3] For the two years preceding the announcement of the Merger, Tad's stock traded at prices ranging from $.50 to $4.00 per share. (DX 86 at 27).

In 1986, the Townsends, who by then were both in their 70's, decided to sell Tad's New York restaurant business. They approached several potential buyers, including The Riese Organization ("Riese"). Tad's asking price for the restaurant business was $12 million. Riese was willing to pay $11 million. Donald Townsend then proceeded to negotiate the sale of the restaurant business to Riese.

Simultaneously, Donald Townsend and Riese also negotiated a consulting and non-competition arrangement (the "consulting and non-competition agreements") wherein Riese agreed to pay $1 million, spread over five years, to each of the Townsends individually for a total of $2 million. In exchange, the Townsends each agreed to advise Riese, when requested, in connection with the newly acquired restaurant business, and to refrain from competing or assisting others to compete with that newly acquired business.

In October 1987, before the Asset Sale could close, the stock market crashed. That development enabled Riese to renegotiate the Asset Sale price payable to Tad's downwards from $11 million to $9.75 million. However, the agreed upon $2 million consideration to be paid to the Townsends for the consulting and non-competition agreements remained unchanged.

At some point during this period, the Tad's board decided that immediately after completing the Asset Sale Tad's remaining businesses should "go private." That is, Tad's would be merged into Newco, a newly-created vehicle wholly owned by the Townsends, and Tad's minority shareholders would be

---

**2.** Mr. Bressler owned 585 Tad's shares, representing 0.1% of Tad's total outstanding shares and having a value, measured by the Merger price, of $7,751.

**3.** Of those shares, 2,000 were owned by Donald Ryan and held in a brokerage account. Those 2,000 shares were inadvertently tendered in the Merger, but that circumstance did not, as a legal matter, deprive Donald Ryan of his appraisal rights with respect to those shares. *Alabama By–Products Corp. v. Cede & Co.*, Del.Supr., 657 A.2d 254, 261 (1995). However, the parties dispute whether the $26,500 payment made by Tad's to Donald Ryan's brokerage account for the 2,000 tendered shares was repaid to Tad's after the error was discovered. The evidence shows that on September 15, 1989, Donald Ryan wrote a letter to his broker directing that the inadvertent tender be reversed. In response, the broker disbursed $26,500 from Donald Ryan's account and reinstated the 2,000 Tad's shares. (PX 4; PX 159). The defendants claim that the 2,000 shares were never reissued and that Tad's never received reimbursement of the $26,500. The defendants also claim that the plaintiffs' evidence of the "reversing" transactions is hearsay.

However, at trial defendants' counsel stated that he would not object to the brokerage statement (PX–159) offered by the plaintiffs, or to the letters exchanged between Donald Ryan and his brokers (PX4), provided that that evidence was "offered to prove simply that Shearson reversed the entry on Mr. Ryan's records." (Tr. at 399). Thus, these documents were properly admitted into evidence (Tr. 396, 400). That evidence constituted a clear *prima facie* showing that the inadvertent tender of Donald Ryan's shares was reversed and that the $26,500 Merger consideration was debited from Ryan's brokerage account. Consequently, the burden of proving that they did not receive the $26,500 shifted to the defendants, who have not met that burden. There was no testimony by Tad's transfer agent that it (the agent) never received the $26,500, and Mr. Bressler's testimony to that effect was conclusory and unpersuasive, since no evidentiary foundation for his testimony was presented. Accordingly, I reject the defendants' argument that the $26,500 should be offset against any damages awarded to the plaintiffs in this action.

"cashed out." The reason, the defendants explain, is that Tad's board of directors (*i.e.*, the Townsends and Mr. Bressler) concluded that the businesses remaining after the Asset Sale would be too small and risky to justify Tad's continuing as a public company. Moreover, Tad's might become subject to regulation under the Investment Company Act of 1940, because after the Asset Sale a significant portion of the company's assets would consist of cash. Thus, the board viewed the Merger plan as an efficient way to (a) distribute the cash Tad's would receive in the Asset Sale, (b) delist Tad's stock, and (c) consolidate the ownership of Cell Tech and EPG into a privately-owned company.

On October 28, 1987, Tad's publicly announced it had reached an agreement in principle to sell substantially all of its restaurant assets to Riese for $9.75 million, and that the Tad's board had determined to merge Tad's remaining operations into Newco immediately thereafter. The shareholders were told that they would receive a cash payment estimated at not less than $12 per share.

The Merger price initially approved by the Tad's board on November 4, 1987, and ultimately approved by shareholders on February 11, 1988, was $13.25 per share. The Tad's board arrived at that price by adding the estimated available cash after the Asset Sale ($6,224,750) to the amounts at which they valued Tad's remaining businesses, Cell Tech ($563,000) and EPG ($1,136,000). From the sum of those amounts the board subtracted $337,518 "to take into account the obligations retained by Tad's, and the continuing personal liability of the Townsends." (DX 86 at 11). The bottom line figure was $7,586,232 which, when divided by Tad's 572,064 outstanding common shares, yielded a price of $13.26 per share, which the board rounded down to $13.25 per share.

It is undisputed that the Tad's board did not retain any unaffiliated law firm, financial advisor, or other independent representative to represent or negotiate the Merger on behalf of the Tad's minority shareholders.

Thus, the Merger terms were determined unilaterally by the Townsends and were not negotiated with anyone.

The Tad's board did hire Muller and Company ("Muller"), an investment banking firm, to furnish an opinion that the $13.25 Merger Price was fair to the minority stockholders of Tad's. Muller had been recommended by Mr. Bressler, who was familiar with Muller because it was a client of his law firm[4] and because Bressler had earlier served as a director of another investment firm that Muller had previously acquired. Muller opined that the Asset Sale price and the Merger price were fair, but it was not asked to, nor did it, opine on the fairness of the Townsends' consulting and non-competition agreements. (DX 86 at III–1).

On November 4, 1987, the Tad's board met to consider the proposed Asset Sale and Merger. At that meeting, Muller orally opined that the Asset Sale and Merger prices were fair, but it did not discuss its underlying valuation analysis with, or provide any written materials to, the directors. Muller did state in a subsequently issued written opinion dated January 8, 1988, that it had reviewed an extensive list of information relating to Tad's businesses and to their historical performance and their future prospects. However, that information did not include financial projections or forecasts because, as the proxy statement disclosed, "[n]o financial projections or forecasts were provided to Muller by the Board." (DX 86 at 12).

At the November 4 meeting, the board authorized the Asset Sale to Riese for $9.75 million, and approved the Merger at a price of $13.25 per share. That same day (November 4, 1987), Tad's entered into a Merger Agreement with Newco. The following day (November 5, 1987), Tad's entered into a definitive Asset Sale agreement with Riese, and the Townsends each executed consulting and the non-competition agreements with Riese.

On November 6, 1987, Tad's issued a press release announcing the terms of the Asset

---

4. Bressler was an attorney and a member of a New York law firm whose clients included the Townsends and Tad's.

Sale and Merger authorized by its board, as well as the terms of the Townsends' consulting and non-competition agreements. The announcement stated that the Asset Sale and Merger were subject to shareholder approval, and that those transactions would become effective "by no later than May 1, 1988." (PX 3).

On January 8, 1988, Tad's disseminated a proxy statement disclosing that the board was recommending that the shareholders approve the Merger. The proxy statement described the proposed transactions, gave notice of a special stockholders meeting to be held on February 11, 1988, and contained Muller's written fairness opinion. Shareholders were asked to approve the Asset Sale and Merger on the terms approved by the Tad's board at its November 4, 1987 board meeting.

At the February 11, 1988 stockholders meeting, the Asset Sale and Merger were approved by a majority of Tad's shareholders. Because that vote included the Townsends' 72.6% controlling interest, shareholder approval was a foregone conclusion.[5] Pursuant to the Asset Sale agreement, Tad's consummated the Asset Sale on May 4, 1988. Under the terms of the November 4, 1987 Merger agreement, the Merger became effective on May 5, 1988, one day later.

As a result of the foregoing events, the Tad's minority shareholders became entitled to $13.25 per share in the Merger for their (in the aggregate) 156,700 shares. That represented a total value of $2,076,275, including the $418,700 value of the Ryans' 31,600 shares. The Townsends exchanged their 396,364 shares, representing $5,251,823 in value, for 100% of the outstanding shares of Newco; and they received $13.25 per share

for 19,000 shares held by a company owned by Neal Townsend, for an additional cash value of $251,750. Thus, part of Tad's was sold to Riese in the Asset Sale, and the rest of Tad's was sold to the Townsends in the Merger, for a total value of $7,579,848.

## II. *THE PARTIES' CONTENTIONS AND THE APPLICABLE LEGAL STANDARDS* [6]

The plaintiffs contend that the Townsends, who were a majority of the Tad's board, had a material conflict of interest in the Asset Sale and Merger, and that as a result the director-defendants have the burden of establishing that the Asset Sale and Merger were entirely fair to Tad's minority shareholders. The plaintiffs claim that the directors have not done that. Specifically, they argue that the directors have not shown that the Asset Sale and Merger were the product of fair dealing, or that those transactions yielded a fair price for the Tad's minority, for which reason the defendants must be found liable and ordered to pay rescissory damages.

The defendants concede that the Merger was a self-dealing transaction.[7] And they do not deny that the simultaneous negotiation of the consulting and non-competition agreements and the Asset Sale, afforded the Townsends an opportunity to benefit themselves at the minority shareholders' expense. (DB at 9). The defendants insist, nonetheless, that the Asset Sale and Merger were conducted fairly in all respects. Alternatively, they argue that even if the Court were to find that the transactions fail the entire fairness standard, any damage award should not exceed the statutory appraisal value of their

---

**5.** The Tad's board did not require that those transactions be approved by the affirmative vote of a majority of Tad's minority shareholders, *i.e.*, the shareholders other than the Townsends. Nor is there any claim or evidence that the transactions did, in fact, receive the approval of a majority of Tad's outstanding minority shares.

**6.** The parties' contentions relating to the merits of the appraisal action are not addressed in this Opinion, because the appraisal is rendered moot by the Court's valuation of the company and by its award of damages in the fiduciary duty ac-

tion. *See, Cede & Co. v. Technicolor, Inc.,* Del. Supr., 634 A.2d 345, 350 n. 2 (1993).

**7.** Respondent and Defendants' Post–Trial Answering Brief ("DB") at 48. The Tad's proxy statement acknowledged that "[t]wo of the three directors of Tad's are members of management and the other is compensated for services as a partner of the law firm which is counsel to Tad's; thus, none of the directors who considered the terms of the Asset Sale and Merger may be regarded as disinterested." (DX 86 at 8).

shares which (the defendants claim) is $13.69 per share.[8]

■ Normally this Court will defer to a decision involving the business judgment of a corporation's directors, because our law presumes that in making a decision of that kind, the directors acted with due care and in good faith to advance the best interests of shareholders. However, that presumption vanishes in cases where the minority shareholders are compelled to forfeit their shares in return for a value that is "determined as a result of a bargaining process in which the controlling shareholder [is] in a position to influence both bargaining parties." *Thorpe v. Cerbco, Inc.*, Del.Supr., No. 345 (Jan. 18, 1996) — A.2d —— (1996); *Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 638 A.2d 1110, 1115 (1994) (*"Lynch I"*) and cases cited therein; *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1168 (1995) (*"Cinerama, Inc."*). In such cases the Court will carefully scrutinize the board's actions to ascertain whether the board instituted measures to ensure a fair process, and whether the board achieved a fair price for the disinterested stockholder minority. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 711 (1983) (*"Weinberger"*). Because the Merger transaction is concededly one in which the Townsends stood on both sides, the defendants have the burden of demonstrating that the Merger was entirely fair.

The standard governing this Court's review of the Asset Sale is more problematic. The defendants urge that the consulting and non-competition agreements were independent of and peripheral to the Asset Sale and, therefore, created no material conflict of interest in the Townsends. Therefore, defendants argue, the appropriate judicial review standard is that which normally applies to transactions negotiated at arm's length: the business judgment rule. The plaintiffs argue, on the other hand, that while the Townsends may have negotiated at arm's length with Riese, they were negotiating at the same time for their own personal benefit, on a matter in which they had a self-interest in potential conflict with the interest of the minority.[9]

■ The business judgment review standard will not apply where the decision under challenge is made by a board a majority of whom have a material conflict of interest in the transaction. The standard for determining if a director has a material self-interest is whether that director "was or would likely be affected" by that self-interest. *Cinerama, Inc.*, Del.Supr., 663 A.2d at 1167 (quoting *Cinerama, Inc.*, Del.Ch., 663 A.2d at 1151).

■ In this case, the Townsends received a $2 million benefit that was not shared with the minority shareholders in the Asset Sale. Had Riese paid that $2 million to Tad's rather than to the Townsends, the Townsends would have realized a smaller distribution, proportionate to their 72.6% shareholdings, of about $1.5 million. By negotiating payments for consulting and non-competition agreements for themselves as part of the Asset Sale, the Townsends stood to (and did) obtain an additional $500,000—over twice the

---

8. This appraisal value, however, is based on a flawed calculation. A corrected calculation yields a (claimed) appraisal value of $13.10 per share. *See, infra,* note 21.

9. The conflict of interest, as plaintiffs view it, stems from the fact that a buyer of a business (here, Riese) is willing to pay only a finite amount for the business, including the business's assets and the agreement of its principal selling stockholder-managers to consult, and not to compete with, the business being acquired. Plaintiffs' position is that the payments for consulting and noncompetition agreements, while different in form from payments for the assets, must nonetheless be viewed as but another component of the total purchase price. Therefore, if a self-interested fiduciary negotiates a significant noncompete/consulting payment for himself, that necessarily would diminish the amount of the value that would be paid to the corporation for its assets. Because that conflict of interest is inherent in any sale of a business where a principal stockholder concurrently negotiates separate side payments for himself, the plaintiffs argue that the defendants should have adopted procedural measures to neutralize that conflict by appointing an independent negotiating representative for the minority stockholders. And if that is not done, plaintiffs argue, the fiduciary who negotiates the side payments must demonstrate that the allocation of the separate payments for (i) the assets and (ii) the non-compete/consulting agreements was entirely fair to the corporation's stockholders.

Townsends' combined annual salaries from Tad's (DB at 47), and representing a 7% premium above the Townsend's *pro rata* share of the $9.75 million gross proceeds. That prospective $500,000 incremental benefit was, therefore, a sufficient incentive for the Townsends to negotiate for the $2 million as a direct side payment to themselves, as opposed to having that amount be paid to Tad's and then distributed *pro rata* to all shareholders. For those reasons, I conclude that the Townsends had a material conflicting personal financial interest in the Asset Sale transaction.

Because the Townsends controlled the negotiation and approval of the Asset Sale in which they were materially self-interested, the business judgment rule does not protect the Tad's board's decision to approve that transaction. *Weinberger*, 457 A.2d at 710. Accordingly, as with the Merger, the defendants have the burden to demonstrate that the Asset Sale transaction, including the $2 million consulting and non-competition payments to the Townsends, was entirely fair to the Tad's minority. *Id.* For the reasons set forth in Part III, *infra*, I conclude that the defendants have not met that burden.

## III. ENTIRE FAIRNESS ANALYSIS

 Entire fairness has two aspects: fair dealing and fair price. *Weinberger*, 457 A.2d at 711. The Court must consider "how the board of directors discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness. . . ." *Cinerama, Inc.*, 663 A.2d at 1172. In determining the transaction's overall fairness, the Court will conduct a unified assessment that involves balancing the process and the price aspects of the disputed transaction. *Id.* at 1179.

In essence, the plaintiffs claim that the board improperly allowed the Townsends, who were interested directors and majority shareholders, to control the negotiation and approval of the Asset Sale and the Merger; and that the Townsends then proceeded to negotiate and obtain approval of an unfair

price in those transactions. More precisely, the plaintiffs contend that the process by which the Merger was negotiated and approved was unfair because the defendants: (i) did not institute any procedural safeguards to protect the interests of the minority shareholders, (ii) made inadequate and misleading disclosures to shareholders about the Asset Sale and Merger, and (iii) failed to reevaluate the fairness of both transactions in light of changed circumstances that intervened during the six month hiatus between the board approval and the consummation of the Asset Sale and the Merger.[10] The plaintiffs contend that the price obtained for minority shareholders in the Asset Sale and Merger was wholly inadequate and unfair because it amounted to little more than a transfer of value from the shareholders to the interested directors.

The defendants respond that they did put into place procedural measures sufficient to protect the minority shareholders' interests, and that the Tad's proxy statement fully disclosed whatever conflicts of interest the defendants had. The defendants further argue that (i) the board did not act improperly by approving agreements calling for the Asset Sale and Merger to be consummated at a future date, and (ii) once those agreements were executed, the board was not contractually entitled to change them, even if the circumstances materially changed.

### A. Fair Dealing: Fairness of the Negotiation and Approval Process in the Transactions

 In assessing the fairness of the process by which a challenged transaction was accomplished, the Court must consider the board's composition and independence; the timing, structure and negotiation of the transaction; how the board and shareholder approval were obtained; and the extent to which the board and the shareholders were accurately informed about the transaction. *Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 669 A.2d 79, 84 (1995); *Cinerama, Inc.*, Del.Ch., 663 A.2d at 1141, 1172–

10. The Court does not reach this third contention, because it finds that the defendants have failed to carry their burden of demonstrating the entire fairness of the Asset Sale and Merger at the time the board approved them.

1176. Each of these factors, where relevant, is separately considered.

### 1. *The Asset Sale*

Claiming that the process by which the Asset Sale was negotiated and achieved was unfair, the plaintiffs contend that the Townsends had an incentive to garner for themselves a disproportionate share of the Asset Sale proceeds at the minority's expense, and that their conflicting self-interest disabled the Townsends from fairly discharging their fiduciary duty to the minority shareholders. Indeed, plaintiffs argue, the Townsends preferred their self-interest to the interests of the minority shareholders that they were duty-bound to protect, by negotiating for themselves $2 million of additional compensation in the form of "sham" consulting and non-competition agreements. The agreements were a sham, the plaintiffs argue, because (a) the Townsends were never called upon to provide consulting services; (b) they were unlikely at their advanced ages (72 and 79) to pose any competitive threat to Riese, as Donald Townsend intended to move to Nevada and Neal Townsend was already living in California; and (c) the Townsends would be entitled to receive $200,000 annually for five years whether or not they survived.

The plaintiffs also claim that the Townsends' conflict of interest was exacerbated by Mr. Bressler—the only other Tad's director—having acted both as Tad's counsel in negotiating the Asset Sale and as personal attorney for the Townsends in negotiating their consulting and non-competition agreements. For these and other reasons,[11] the plaintiffs conclude, the process by which the defendants negotiated, approved, and carried out the Asset Sale was unfair to the Tad's minority.

The defendants assiduously deny that the consulting and non-competition agreements were a "sham" or that the Townsends diverted a disproportionate share of the Asset Sale consideration to themselves. The defendants emphasize that the $2 million consideration

for the consulting and non-competition agreements was not negotiated until after the parties had first agreed to the initial $11 million Asset Sale price. They also note that although it was Donald Townsend who first raised the issue of consulting and non-competition agreements, it was Riese who insisted upon having those agreements. The defendants' case, simply put, is that the Townsends were entitled to be compensated for accepting restrictions on their future business activities, and that the plaintiffs have failed to prove that if there had been any reduction in the $2 million amount payable to the Townsends, that differential would have been paid to Tad's.

██ I find, for the following reasons, that the defendants have not met their burden of showing that the process by which the Asset Sale was negotiated and approved was fair.

To begin with, the post-market-crash Asset Sale price reduction to $9.75 million shows that the initial $11 million Asset Sale price was not fixed in stone, and the contracting parties' own conduct confirms that the Asset Sale price and the consulting and non-competition payments were interrelated. The defendants concede that Donald Townsend could have negotiated a reduction in the Asset Sale price payable to Tad's, in exchange for an increase in the amounts payable to the Townsends for their consulting and non-competition agreements. Indeed, at one point in the negotiations Riese suggested doing precisely that. (DB at 9). Although Donald Townsend did not take advantage of that opportunity, that is no answer because the "fair dealing" issue is whether he should have been in a position to do so at all. In this Court's opinion, he should not have been. In these circumstances, the board's decision not to provide independent representation or other structural protections for the minority shareholders' interests fatally impaired the fairness of the negotiation and approval process.

The defendants were required to, but did not, demonstrate that they took measures

---

11. The plaintiffs also contend that the engagement of Muller as investment advisor was insufficient to protect the minority against the risks resulting from the board's conflict of interest, because Muller was not separately retained to represent the minority.

that would have offset or neutralized the Townsends' inherent conflict of interest. Neither Bressler, as legal counsel, nor Muller, as financial advisor, were shown to have independently or adequately represented the distinctive interests of the minority shareholders in the Asset Sale. Bressler, who was acting for both the Tad's shareholders and the Townsends personally, and who owned no significant stock interest in his own right, could hardly have been counted on to vigorously advocate the interests of the minority shareholders. To do so would compromise the individual interests of his clients, the Townsends. For its part, Muller had been retained by the majority-interested board, and it was not asked to opine on the fairness of the consulting and non-competition agreements or to assist in negotiating against the conflicted directors on behalf of the minority stockholders.

The absence of any disinterested representation of the minority shareholders' interests is tellingly evidenced by the fact that, after the October 1987 stock market crash, the Tad's board acceded to a $1.25 million reduction in the Asset Sale price payable to Tad's, but did not insist upon a proportionate reduction in the $2 million consulting and non-competition consideration payable to the Townsends. A truly independent board motivated to protect the minority shareholders' interest would have attempted to minimize the price reduction to the corporation by (for example) insisting upon a corresponding *pro rata* reduction in the non-competition and consulting payments. There is no evidence that that was ever proposed, and it is undisputed that it was never done.

■ The defendants have also failed to demonstrate fairness in the process by which director and shareholder approval of the Asset Sale was obtained. The Townsends dominated Tad's board and controlled 72.6% of the voting power of the corporation, and

their votes made both approvals a foregone conclusion. For that reason, these approvals cannot be accorded any significance as evidence of fair dealing.[12]

## 2. *The Merger*

■ The plaintiffs claim that the process by which the Merger terms were formulated and approved was also the product of unfair dealing. They contend that following the Asset Sale, the Tad's board of directors arbitrarily assigned a value to Tad's remaining assets and then retained a non-independent investment advisor, who conducted an inadequate investigation, to bless those arbitrary values.

First, the plaintiffs argue that Muller was not sufficiently independent to opine reliably on the fairness of the proposed Merger terms, because of Muller's substantial ties to Bressler and his law firm, and because Muller's financial investigation and analysis was inadequate to reach an informed opinion concerning the fairness of the Merger terms. The plaintiffs point out that Muller never reviewed the sales and earnings projections for Cell Tech or EPG, and therefore was in no position to evaluate critically the Merger price that the conflicted Tad's board had unilaterally selected.

The defendants respond that they recognized from the outset that the Merger would be a self-dealing transaction, and took appropriate measures to assure that the resulting price would be fair. The defendants claim that they relied upon Tad's "advisors" (*i.e.*, Tad's auditors) to estimate the net proceeds of the Asset Sale,[13] (DB at 42) and that they relied upon Muller to opine on the fairness of the Merger terms. Finally, the defendants say, all potential conflicts were fully disclosed in the Proxy Statement. The defendants concede that they adopted no other measures to ensure adequate minority shareholder representation, but the reason (they say) is that

---

12. This is not to suggest that a "majority of the minority" approval was required as legal matter. Clearly it was not. *Williams v. Geier*, Del.Supr., 671 A.2d 1368 (1996). However, the utilization of that structural safeguard, or its absence, is a factor that this Court will consider in determining whether there was fair dealing.

13. The record indicates that the amounts deducted from the gross Asset Sale price for anticipated tax liabilities were estimated by Tad's auditors. However, all other deductions, including those for legal and accounting costs and those for employee bonuses, were estimated by the Tad's board. (Tr. at 566–567).

they wanted to avoid "expenditures disproportionate to the businesses to be valued" in the Merger. (DB at 48).

I find the defendants' response wholly unpersuasive. In these circumstances the absence of any adequate independent representative for the minority shareholders, and of any arms length negotiation over the Merger terms, precludes a finding that the Merger was the product of fair dealing.

Although Tad's auditors estimated the amount Tad's shareholders should receive from the Asset Sale, that afforded no meaningful protection for the minority because Donald Townsend, a self-interested fiduciary, negotiated both the Asset Sale and the consulting and non-competition agreements. Muller was in no position to provide an independent financial valuation of Tad's remaining assets or to represent adequately or independently the interests of the minority. Muller had no allegiance to the minority shareholders: it was not retained by a committee of independent directors to which it would be solely accountable and on whose behalf it would be authorized to act. Muller was retained by an interested board, and it cannot be presumed that that firm would have acted contrary to the wishes of its client.

Moreover, the defendants have not shown that Muller engaged in an independent, critical evaluation of the Merger price unilaterally fixed by the conflicted board. The record is bereft of any evidence of the scope or depth of Muller's investigation, and of any evidence supportive of the conclusion Muller reached. Muller furnished no "back up" materials to the board either before or after it rendered its fairness opinion. No "back up" materials supportive of that firm's opinion were introduced into evidence at the trial, and no representative of Muller was called as a trial witness to explain or defend that

firm's conclusion. The inescapable inference is that Muller's primary role was to bless the Merger price predetermined by the interested board which retained that firm.

The defendants explain their failure to institute any procedural safeguards to replicate an arms length bargaining process in terms of a desire to minimize transaction costs. That is no justification at all. A desire to control costs cannot relieve corporate fiduciaries from their duty to assure that the interests of minority shareholders in a self-dealing transaction are adequately protected. Finally, even if (as the defendants argue) all potential conflicts of interest in the Merger transaction were fully disclosed, the shareholders' approval of the Merger afforded the minority no meaningful protection, because the approving vote included the Townsends' 72.6% interest. There is no claim or evidence that the Merger was also approved by a majority of the minority shareholders entitled to vote.

\* \* \*

I therefore conclude that the defendants have failed to carry their burden of proving that the Asset Sale and the Merger were the product of fair dealing.

### B. *Fair Price and Its Various Components*

■■■■■ The Court next evaluates the fairness of the prices received in the Asset Sale and the Merger. It is the defendants' burden to demonstrate to the satisfaction of the Court that those transaction prices were values "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value ..." *Cinerama, Inc.*, Del. Ch., 663 A.2d at 1143.[14] The Tad's board arrived at the Merger price of $13.25 per share as follows:

---

**14.** In this case, the market price for Tad's shares prior to the announcement of the Asset Sale and Merger reflected the existence of the Townsends 72.6% control block, and also illiquidity due to the relatively small number of outstanding minority shares being traded. In such circum- stances the market price of Tad's shares will not be regarded as a reliable or an appropriate measure of Tad's "fair" value. *See, Kahn v. Tremont Corp.*, Del.Ch., C.A. No. 12339, Allen, C., Mem. Op. at 21–24, 1996 WL 145452 (Mar. 21, 1996).

| Valuation: $000 | Tad's Board |
|---|---|
| Asset Sale (not tax) per share | 6,224.75 $10.87 |
| Indemnification per share | (337.518) ($0.59) |
| Call Tech per share | 563.0 $0.98 |
| EPG per share | 1,136.0 $1.99 |
| TOTAL per share | 7,586.232 $13.25 |

Because the plaintiffs attack the defendants' valuations of all four of these price components, each contested component is separately addressed.

### 1. *The Asset Sale Price*

 The plaintiffs argue that the payment of $2 million to the Townsends for the consulting and non-competition agreements evidences that the Asset Sale price was not fair because those agreements had little or no value. Therefore, the plaintiffs conclude, the $2 million was—and should be deemed— a part of the overall transaction price paid for the corporation's assets, that the Townsends wrongfully diverted to themselves.

The defendants insist that the Asset Sale price was fair and deny that the $2 million consulting and non-competition agreements were a "sham." They contend that the plaintiffs have adduced no evidence that the Asset Sale agreement had any higher value than what was negotiated, or that if the payments to the Townsends had been reduced, the $9.75 million Asset Sale price would have been correspondingly increased.[15]

I regard this latter argument as a thinly disguised (and improper) effort to shift the burden of proof to the minority shareholders.

It is the defendants who stood on both sides of the transaction and dictated its terms, and it is they who were obligated to persuade the Court that the price they selected was fair. The defendants have failed to carry that burden.

The defendants have not persuaded me that the consulting and non-competition agreements were objectively worth $2 million—a 21% premium over the $9.75 million Asset Sale price—to Riese. The defendants presented no testimony of Riese or of any independent expert on this question.[16] The circumstances make it apparent that at the time agreement was reached, the parties were aware that those provisions would likely never be invoked.[17] All contracting parties knew that after the completion of the Asset Sale, Donald Townsend (who was 79 years old) planned to retire to Nevada and Neal Townsend (who was 72 years old) would continue living in California and operating a restaurant business there. The restaurants Riese was acquiring were all located in New York City, almost 3,000 miles away. Those facts, while not conclusive on the value (or lack thereof) of the side agreements to Riese, do support the plaintiffs' position that Riese had no intention of calling upon the Town-

15. The defendants also emphasize that this transaction structure (as opposed to one where all of the consideration was payable to Tad's at the time of the Asset Sale) had certain cash flow and tax advantages to Riese. That may well be true, and those factors may be probative on the question of whether the transaction structure was reasonably fair to Tad's minority shareholders. However, they are not significantly probative on the issue of whether disproportionate consideration was diverted from the shareholders as a group to the majority stockholders individually.

16. One document created by the Riese organization indicates that during the negotiations, Riese

was considering (before the stock market crash) an $11 million purchase price that explicitly *included* the cost of a restrictive covenant and a management consulting agreement. (PX 6).

17. In fact, they never were. For two months after the Asset Sale and before he left New York for Nevada, Donald Townsend assisted in the transition of the restaurant business to the new owners. (Tr. 749–751). However, as defendants' own expert testified, such temporary accommodations are customarily provided by sellers of businesses, independently of any obligation contracted for under a consulting agreement. (Tr. at 905–906).

sends for consulting services and that the Townsends had no intention of competing with Riese. They also support the inference that the agreements, viewed objectively, were not worth $2 million, and that Riese was willing to pay that amount in order to obtain an item of value unrelated to those agreements: the Townsends' assent, as Tad's majority stockholders, to the Asset Sale.

The defendants have adduced no persuasive evidence to the contrary, despite having had ample opportunity to do so. Because they have not established the fairness of the allocation of consideration as between the corporation and the Townsends, the defendants have not satisfied the Court that the Asset Sale price was fair to the minority stockholders of Tad's.

### 2. *The Merger Price*

The plaintiffs also contend that the Merger price was not fair, because: (i) its largest component was the Asset Sale price, which (as this Court has now found) was not shown to be fair, (ii) the Merger price rested upon undervaluations of Cell Tech and EPG, and (iii) the Merger consideration was reduced by over-deductions for tax and indemnity reserves. For the reasons next discussed, those contentions are valid.

### (a) *Asset Sale Price*

Because the largest component of the $13.25 Merger price was the $10.87 per share Asset Sale price which has not been shown to be fair, it follows, for that reason, that the Merger price was not shown to be fair. However, the board's valuations of the other components of the Merger price also compel that conclusion.

### (b) *Reserve for Estimated Tax Liabilities*

The Merger price is also claimed to be unfair because the Tad's board over-reserved for anticipated tax liabilities. It is undisputed that the board deducted from the monies to be paid to Tad's shareholders in the Merger, $3,964,000 for anticipated taxes relating to the Asset Sale. It also is undisputed that Tad's actual tax liability was $2,597,205. The result was an over-reserve of $1,366,795 that benefitted Newco and thus Newco's owners, the Townsends. The plaintiffs argue that the over-reserve was intended to generate a windfall for Newco. Alternatively, they contend, even if the over-reserve was inadvertent, its magnitude and the board's failure to provide for its repayment to the minority shareholders, clearly evidences that the Merger price was not fair.

The defendants' response is as follows: the plaintiffs have not proved that the over-deduction for future taxes was deliberate or in any way wrongful. The amount of the tax liability reserve was estimated by Tad's auditors, based on their assumption that the transaction would close shortly before the end of the fiscal year ending April 30, 1988. Only because of a six day delay in the Asset Sale closing, which moved that closing into the more tax advantageous 1989 fiscal year, did the tax liability turn out to be less than the originally reserved amount. Thus, defendants conclude, the over-reserve was fortuitous and unplanned, and ought not to be a basis for imposing liability upon them.[18]

The defendants' burden required them to show that the amount deducted from the Merger price as a reserve for future taxes was fair. *Cinerama, Inc.*, Del.Ch., 663 A.2d at 1143. I conclude that the defendants have failed to make that showing. To the extent that the Tad's board relied upon the company's auditors to estimate the amounts to reserve for future taxes relating to the Asset Sale, that factor favors the defendants. However, that does not end the analysis,

---

18. The defendants also argue that Tad's tax burden was lower in fiscal year 1989 than it would have been in fiscal year 1988, because Newco generated losses in that year that offset Asset Sale gains, partly because of substantial increases in the salaries of the Townsends. The defendants contend that the plaintiffs should not be permitted to benefit from the reduced tax liability unless they are also willing to share in Newco's losses that contributed to the reduction. This argument sidesteps the issue, which is whether it was reasonable for the Tad's conflicted board, *at the time of the Merger*, to deduct the amount of the reserve for Tad's future tax liabilities from the Merger consideration without providing for a (pro-rated) repayment to the minority shareholders of any overreserved excess.

because even if the directors estimated a reasonable amount to reserve, they made no effort to protect the minority stockholders' interests if the reserve later proved to be excessive. Had the Merger been negotiated by an independent representative of the minority shareholders, the possibility of an over-reserve would in all likelihood have been anticipated, and a *pro rata* distribution of any excess reserves to *all* of Tad's shareholders would have been provided for. Here, however, the interested board of Tad's approved a Merger agreement with no provision for repayment of any excess reserves to Tad's shareholders. Instead, the Townsends were permitted to retain the "windfall" solely for their own benefit, which was unfair.

Because the defendants have not adequately addressed these concerns the defendants have failed to establish that the "excess" tax reserve component of the Merger price was fair.

### (c) *Reserve for Asset Sale Indemnity*

■ The plaintiffs next contend that the further reduction of the Merger price by $337,000 to secure certain indemnity rights of Riese in the Asset Sale, also establishes that the Merger price was not fair.

The Asset Sale agreement required Tad's to deposit $500,000 in escrow to secure an indemnity obligation, running in favor of Riese, against damages arising from any breaches of the Asset Sale agreement (the "indemnity reserve"). The plaintiffs contend that the Townsends funded approximately $337,000 of this escrow deposit by deducting that amount from the Merger price. That indemnity reserve was to remain in place for two years, at which point any unutilized funds would be returned to Tad's. In fact the $500,000 was never utilized, and at the end of the two year period the funds were restored to Tad's. However, the Tad's to which those funds (including the $337,000) were restored was the post-merger Tad's, which was a subsidiary of Newco. Thus, the

minority shareholders derived no benefit from that restoration.

The plaintiffs claim that the Tad's board should either have not deducted the $337,000 from the Merger price at all, or, alternatively, should have provided that any unutilized portion of the $337,000 be repaid to Tad's shareholders as of the Merger date. Had the latter course been chosen, the minority shareholders' proportionate share of the unutilized indemnity reserve would have been about $100,000.

The defendants concede that $337,518 was deducted from the Merger price.[19] They argue, however, that those monies were not used to fund the indemnity reserve but, rather, represented compensation to the Townsends for assuming unique risks in the Asset Sale transaction. As the defendants explain it, Riese required Tad's (as a subsidiary of Newco), and the Townsends personally to furnish an indemnity against liabilities arising out of potential breaches of the Asset Sale agreement and also to guarantee Newco's obligations to Riese. According to the defendants, the Tad's board decided that the Townsends should be compensated for the risks they assumed in agreeing to these arrangements, and that such compensation took the form of a $337,518 deduction from the Merger price. It is undisputed that the minority shareholders' pro rata share of the $337,518 would have been approximately $100,000.

Regardless of which of these competing characterization of the facts is accepted, the issue is the same: have the defendants shown that the $337,518 deduction from the Merger price was entirely fair to the minority shareholders? In my view they have not, because the claim that the $337,518 deduction was fair compensation to the Townsends for assuming unique risks created by the Asset Sale agreement, is without evidentiary support. The record does establish that in the Merger the Townsends (through Newco) as-

---

19. Somewhat inconsistently the defendants also claim that the plaintiffs *"erroneously* contend that the deduction was $337,000 ... [when only] ... approximately $100,000, or $0.59 per minority share, was deducted from the Merger price." (DB at 42, n. 27, emphasis added). However,

$0.59 per share × Tad's 572,064 outstanding shares equals $337,518, and $100,000 represents the minority shareholders' proportionate share of that amount. The plaintiff's contention that the total deduction was $337,000 is, therefore, not "erroneous" as defendants suggest.

sumed Tad's liabilities, including its contingent liabilities. However, the defendants point to no record evidence that Newco and the Townsends "negotiated" a specific deduction from the Merger price to "compensate" the Townsends for assuming those particular risks. The minutes recording the board's decision to pay $337,518 as compensation to the Townsends provide only a conclusory statement to that effect, and the record contains no evidence that independently corroborates that conclusory statement or shows how the $337,518 amount of such "compensation" was arrived at. I, therefore, am unable to conclude that the retention of this amount for the benefit of the Townsends was fair.

**(d)** *The Valuations of Cell Tech and EPG*

█ The plaintiffs next claim that the Tad's board undervalued Cell Tech and EPG in the Merger. Specifically, the plaintiffs argue that in arriving at the Merger price, (a) the board valued Cell Tech based solely on Tad's historical dollar investment in that business ($563,000), without taking into account Cell Tech's significant future earnings potential; and that (b) EPG was valued at net book value ($1,136,000) which not only was an improper measure of EPG's fair value, but also was understated because it was the product of accelerated depreciation accounting treatment.

The plaintiffs also point to post-Merger events as confirming the unfairness of the board's valuation of Cell Tech. Four months after Cell Tech was valued at $563,000 for purposes of the Merger, the manager of Cell Tech, Daryl Kollman, and his wife offered to buy Cell Tech from Newco for $1,330,000, payable in three year notes. The Townsends rejected that offer. Later, in September 1989, one and one-half years after the Merger, the Townsends granted the Kollmans an option, exercisable for six months, to purchase Cell Tech for $4,400,000. The option was not exercised. Finally, in August 1990, two and one-half years after the Merger, the Kollmans purchased outright the assets of Cell Tech from Tad's (then a subsidiary of Newco) for $3,789,470. Approximately $3.5 million of that purchase price took the form of a ten year note at 19% annual interest; another $200,000 took the form of a five year

note at 13% annual interest. In that transaction, Tad's also obtained the right to receive certain additional "override" payments based on Cell Tech's future revenue. Between August 1990 and the October 1994 trial, those "override" payments totaled $741,568. The plaintiffs argue that the foregoing facts establish that the board's $563,000 valuation of Cell Tech in the Merger was not fair.

The plaintiffs contend that the board's valuation of EPG was also not fair. As earlier noted, EPG was valued at its book value less an outstanding $400,000 loan, for a net book value of $1,136,000. That net book value figure reflected the accelerated depreciation of EPG's capital assets over five years, rather than over those assets' thirty year useful life.

The plaintiffs contend that the defendants knew that the use of a book value based on accelerated depreciation would understate EPG's fair value. Indeed, during the trial Mr. Bressler admitted that the Board "knew the depreciation was very heavy and, therefore, the profit and loss was not an accurate measure of its value to us." (Tr. at 566). If the board knew that the artificially high annual depreciation charges distorted the profit and loss statement, then, the plaintiffs argue, they must also have known that those charges would also distort EPG's balance sheet.

\* \* \*

The defendants have failed to respond both to the foregoing challenges of the EPG and Cell Tech valuations and to the plaintiffs' *prima facie* showing that the Merger price was unfair. That is, the defendants have made no effort to show that those valuations were fair. Instead, they attempt to sidestep the entire fairness issue by arguing that the appropriate measure of damages is Tad's statutory appraisal value, which (defendants claim) is less than the value the plaintiffs seek as the measure of damages. Because the defendants made no serious effort to defend the fairness of the board's valuation of EPG or Cell Tech, and because the Court has found that the plaintiffs' fair price arguments are meritorious and that the value of Tad's far exceeds the Merger price (see Part

IV, *infra*), it follows that the defendants have failed to establish that their valuation of Tad's in the Merger was fair.

\* \* \*

To summarize, the defendants have failed to prove to the Court's satisfaction that the Asset Sale and the Merger were the product of fair dealing or that they yielded a fair price. The absence of any adequate independent representation or procedural safeguards to protect the minority shareholders' interests; the absence of persuasive evidence that the consulting and non-competition agreements had significant value; the $563,000 valuation of Cell Tech in the Merger, followed by a $1.3 million offer for that same business (which the Townsends rejected) only four months later; and the defendants' failure to justify the board's valuation of Cell Tech and EPG—all impel me to conclude that the Asset Sale and Merger cannot pass the test of entire fairness. The defendants, accordingly, are liable to the plaintiffs for breaching their fiduciary duty of loyalty. The question then becomes: what is the extent of that liability?

## IV. *DETERMINATION OF DAMAGES*

### A. *Introduction*

■ Having found that the defendant directors are liable, the Court must next determine an appropriate damages award. Were this action solely one for an appraisal pursuant to 8 *Del.C.* § 262, the plaintiffs would be limited to a recovery of the "fair value" of their shares, "exclusive of any element of value arising from the accomplishment or expectation of the merger." 8 *Del.C.* § 262(h); *In the Matter of the Appraisal of Shell Oil Company*, Del.Supr., 607 A.2d 1213, 1218 (1992). However, the measure of damages for breach of fiduciary duty is not limited to the corporation's fair value as determined in an appraisal. *Weinberger*, 457 A.2d at 714. Rather, in that procedural setting, the Court "may fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages." *Id.*

The plaintiffs here seek rescissory damages on the basis that the directors breached their duty of loyalty and as a result, obtained substantial personal financial benefits for themselves at the minority stockholders' expense. The defendants respond that the plaintiffs should be precluded from recovering rescissory damages, because they unduly delayed in asserting their fiduciary duty claims and have otherwise failed to demonstrate that the appraisal remedy would be inadequate.

■ An award of rescissory damages may be appropriate in cases where directors are found to have breached their duty of loyalty. *Id.* However, because that remedy is grounded upon restitutionary principles, it is appropriate in cases involving "at a minimum persuasive evidence that the board was actually motivated by interests other than those of the shareholders ..." *Cinerama, Inc.*, Del.Ch., 663 A.2d at 1149. That is, an award of rescissory damages would be most appropriate where it is shown that the defendant fiduciaries unjustly enriched themselves by exercising their fiduciary authority deliberately to extract a personal financial benefit at the expense of the corporation's shareholders.

■ In this case, the directors' "actual" motivations in negotiating and carrying out these transactions are hotly disputed. The evidence goes both ways. However, in the end, it is unnecessary for this Court to undertake a pursuit of the directors' elusive subjective motives for their conduct, because the record clearly establishes that the plaintiffs unreasonably delayed in asserting their fiduciary duty claims. That delay makes it inequitable for this Court to award rescissory damages in this case.

As the defendants correctly point out, this case was initially filed in September 1988, and thereafter was repeatedly permitted to languish. In many instances the defendants had to prod the plaintiffs into further action. In March 1990, motivated by the need to preserve the testimony of the Townsends because of their advanced ages, the *defendants* noticed their own depositions. In February 1991, it was the *defendants* who asked that the case be scheduled for trial. Only thereafter, in February 1991, did the plaintiffs assert their fiduciary duty claim, but

thereafter did not diligently pursue those claims. In February 1993, the *defendants* requested that the action be removed from the active calendar because of the plaintiffs' failure to prosecute. And, after further discovery, it was the *defendants* who requested a conference in January 1994 to schedule a trial date.

The plaintiffs claim that they did not delay excessively. They argue that they did not know the facts underlying the fiduciary duty claim until after they conducted discovery in the appraisal proceeding. The record repeatedly undermines that assertion. (PX 60, Tr. 451–454, 436–437, 438–439, 440, 443–444, 455). To cite but one example, plaintiff Donald Ryan's own notes disclose that, as early as November 1987, four years before the fiduciary claim was asserted, he believed that the consulting and non-competition agreements were a "fraud upon the minority stockholders of Tad's perpetrated by the management of Tad's as well as the Rieses". (PX 60).[20]

■ "It is a well-established principle of equity that a plaintiff waives the right to rescission by excessive delay in seeking it." *Gaffin v. Teledyne, Inc.,* Del.Ch., C.A. No. 5786, Hartnett, V.C., Mem.Op. at 49, 1990 WL 195914 (Dec. 4, 1990), *aff'd,* Del.Supr. 611 A.2d 467 (1992). The underlying policy reason is that excessive delay enables a plaintiff otherwise to "sit back and 'test the waters'," opportunistically waiting to see whether the defendants achieve an increase in the value of the company above its likely

appraisal value, before deciding to assert a claim for rescission, or its monetary equivalent, rescissory damages. *Id.* The law "does not ... promote speculative damages at the [defendant's] expense." *Myzel v. Fields,* 386 F.2d 718, 740–741, n. 15 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). This case, in my view, fully merits the application of that principle.

■ That is not to say that this Court will ignore post-merger events that bear on the value of Tad's as of the Merger date. Indeed, because the directors of Tad's have been adjudicated in breach of their duty of loyalty, the damages award will not be limited to what would be recoverable in a statutory appraisal, as the defendants urge. Rather, the Court will exercise its discretion to craft from the "panoply of equitable remedies" a damage award that approximates a price the board would have approved absent a breach of duty. *Cinerama, Inc.,* Del.Ch., 663 A.2d at 1137, *Weinberger,* 457 A.2d at 714.

## B. *The Damages Valuation*

■ Having determined the nature of the damages to be awarded, the Court must next determine the appropriate valuation for each of the disputed components of Tad's at the time of the Merger. The following table provides an overview of the parties' valuation positions[21] and the result this Court ultimately reaches:

---

20. The plaintiffs also contend that the delay should not be attributed solely to themselves. They argue that during discovery the defendants withheld relevant evidence regarding the Kollman offer to buy Cell Tech four months after the Merger, and the option to buy Cell Tech given to the Kollmans in September 1989. While these alleged discovery abuses cannot be condoned, they do not justify the plaintiffs' pervasive pattern of delay during the six year period between the May 5, 1988 Merger and the October 1994 trial.

21. Actually, the plaintiffs contend that the fair value of Tad's is $31.07 per share and the defendants contend that the fair value is $13.69 per share. However, both of these figures are based on an error in calculation. Both the plaintiffs and the defendants assume that the $6,224,750 net proceeds from the Asset Sale (determined by the Tad's board) are net of the $337,518 payment to the Townsends relating to the Asset Sale indemnity. However, as the Tad's board meeting minutes (DX 77 at 6–7) and the Tad's proxy statement (PX 86 at 11) make clear, that is not so. The error is corrected here.

| Valuation: $000s | Tad's Board | The Plaintiffs | The Defendants | The Court |
|---|---|---|---|---|
| Asset Sale | 6,224.75 | 8,224.75 | 6,224.75 | 8.224.75 |
| per share | $10.87 | $14.37 | $10.87 | $14.37 |
| Excess Tax Reserve | — | 1,366.795 | — | 1.366.795 |
| per share | | $2.39 | | $2.39 |
| Indemnification | (337.518) | — | (337.518) | — |
| per share | ($0.59) | | ($0.59) | |
| Cell Tech | 563.0 | 3,872.39 | 833.0 | 2,923.76 |
| per share | $0.98 | $6.77 | $1.46 | $5.11 |
| EPG | 1,136.0 | 2,390.0 | 772.5 | 1,136.0 |
| per share | $1.99 | $4.18 | 1.35 | $1.99 |
| Other Claims | — | 1,617.0 | — | — |
| per share | | $2.83 | | |
| TOTAL [22] | 7,586.232 | 17,470.935 | 7,492.732 | 13,651.265 |
| per share | $13.26 | $30.54 | $13.10 | $23.86 |

### 1. *Asset Sale Damages*

The plaintiffs claim that the amount of damage they suffered in the Asset Sale is their proportionate share (5.5%) of the $2 million the Townsends diverted in the form of consulting and non-competition agreements.

The defendants respond that the plaintiffs have failed to prove both the actual value to the Townsends of the consulting and non-competition agreements, and the additional amounts (if any) Riese would have paid to Tad's for the restaurant assets, assuming that the consulting and non-competition payments were eliminated or significantly reduced. The defendants say that the cash cost to Riese of the consulting and non-competition payments would have been less than the cost to Riese of the payments for the restaurant assets, because the former were tax deductible and payable over five years, while the latter were nondeductible and payable all at once.

The defendants further argue that even if Riese had allocated all of the additional $2 million to Tad's as part of the Asset Sale price, the net value realized by shareholders would have been significantly less than $2 million, because Tad's would have paid real estate transfer taxes and New York City, State, and federal capital gains taxes on the incremental consideration. The defendants contend that because the plaintiffs failed to quantify any of those expense factors, the Court cannot possibly determine the amount of any actual, specific damage to shareholders from the $2 million consulting and non-competition payments.

However, the defendants are unable to point to anything of record supportive of these contentions. It well may be that Tad's would have owed taxes on any increased Asset Sale consideration. It may also be the case that Riese would not have agreed to pay the entire $2 million to Tad's if that payment were not tax deductible. But there is no persuasive evidence that supports, let alone compels, a fact finding to that effect. What is established by a preponderance of the uncontroverted evidence is that the consulting and non-competition agreements were of *de minimis* value. The advanced ages and personal plans of the Townsends strongly indicate that Riese did not intend to consult the Townsends regarding the operation of the restaurant business, and that the Townsends posed no competitive threat to Riese. Because $2 million was paid to the Townsends for consulting and non-competition agreements having minimal or no value, it must be concluded that those payments were, in reality, part of the consideration for the Asset Sale, disguised as payments for consulting and non-competition agreements.

It was incumbent upon the defendants to present evidence to support their position

**22.** The difference between the board's valuation of Tad's ($7,586,232) and the value realized by Tad's shareholders ($7,579,848) is accounted for by the Board having rounded the $13.26 per share value down to $13.25 per share.

that the Asset Sale price would not have been increased by $2 million, if all of the consideration was to be paid to Tad's. The defendants have not proved that case. Given the absence of any persuasive evidence to the contrary, I must conclude that but for the diversion of $2 million to the Townsends, the net Asset Sale consideration would have been $2 million more than the $6,224,750 Asset Sale price approved by the interested Tad's board, *i.e.,* $8,224,750.

### 2. *The Tax and Indemnity Reserve Damages*

The plaintiffs contend, and I agree, that the "overdeductions" by the Tad's board for taxes and the indemnity obligation resulted in damage to the plaintiffs equal in amount to their proportionate share of those overdeductions. The Court has already concluded that if there had been independent negotiation on behalf of the minority shareholders on these issues, a fair outcome would have been a provision that the unutilized portion of those reserves would be distributed *pro rata* to all shareholders.

Accordingly, I find that (i) the $1,366,795 of unused tax reserves should have been distributed *pro rata* to all of the Tad's former shareholders and that (ii) the $337,518 relating to the Riese indemnity should either have not been deducted from the Merger price at all, or have been made distributed *pro rata* to all former Tad's shareholders instead of to Newco. That finding results in a $1,703,795 increase in the Merger price.

### 3. *Cell Tech Damages*

The plaintiffs advance three separate valuations of Cell Tech. The first assumes a rescission of the Cell Tech sale. Under that approach, the plaintiffs claim entitlement to: (i) their proportionate share of all Cell Tech profits between the Merger date and the August 1990 sale of Cell Tech to Daryl Kollman, (ii) all payments received from Kollman between the August 1990 sale and the date of trial, and (iii) the present value of all future (*i.e.,* override) payments. Because this valuation would amount essentially to an award of rescissory damages, it will not be considered for that reason.[23] *See* Part IV A, *supra* of this Opinion.

Second, the plaintiffs advocate a "liability action" valuation methodology, based upon the value of the notes the Kollmans paid to purchase Cell Tech in August 1990. To that value plaintiffs add the discounted value of all override payments Tad's received from the Kollmans through the October 1994 trial date, plus the discounted value of projected override payments receivable between October 1994 through July 2000. The sum of these amounts is claimed to represent Cell Tech's value at the time of its sale to the Kollmans in August 1990. From that value the plaintiffs subtracted Cell Tech's after-tax earnings for the period May 1988 through August 1990, to arrive at a net valuation of $4,070,490 for Cell Tech as of the Merger date.

The defendants contend that this approach would also be tantamount to awarding rescissory damages in a slightly different form, because it rests upon 20/20 hindsight and fails to take into account the significant business risks Cell Tech faced at the time of the Merger. Specifically, the defendants argue that this methodology does not reflect the risks that Cell Tech's future profitability depended critically upon the continued success of a single "fad" product line, and that Cell Tech's business could be shut down at any time by a U.S. Food and Drug Administration ("FDA") enforcement action.[24] Finally, the defendants argue that this valuation approach fails to account for the Townsends' nearly $1 million post-Merger investment in

---

23. In conjunction with their calculation of rescissory damages, the plaintiffs also rely on a so-called "cash collection" methodology which, at the eleventh hour, they attempted to introduce into the case by slipping a reference to it into the pre-trial order. Because the plaintiffs failed to provide the defendants with fair pre-trial notice of their intention to use this methodology, the Court will not consider it either.

24. Prior to 1988, Cell Tech had been found by the FDA to have violated various provisions of the Federal Food, Drug & Cosmetics Act by, *inter alia,* making unsubstantiated therapeutic claims. (DX 28).

Cell Tech, and assumes an unrealistically low discount rate. I conclude that these objections are well founded and reject this second approach as well.

The plaintiffs' third methodology is a discounted cash flow valuation—an approach the defendants also advocate. In that context, the only subject on which the parties disagree concerns the projections of future Cell Tech cash flows that should be used in the model. For the following reasons, the Court adopts this methodology to value Cell Tech for purposes of determining an appropriate damages award.

The record discloses significant evidence of Cell Tech's value as reflected in the dealings between the Townsends and Daryl Kollman in connection with the sale of Cell Tech. Four months after the Merger, Kollman offered to buy Cell Tech for approximately $1.33 million, payable in three year notes. The Townsends' rejection of that offer evidences their belief that Cell Tech was worth more than $1.33 million. The question is how much more. As earlier stated, one year later the Townsends granted the Kollmans an option to purchase Cell Tech for $4.4 million, but the Kollmans did not exercise that option. Finally, two years after the Merger, the Kollmans purchased Cell Tech outright for $3.8 million, consisting mostly of notes payable at 19% interest, plus an override on future sales. By 1990, however, Cell Tech's circumstances had changed dramatically and other value-creating events unrelated to the Merger had intervened.

These indications of value, while helpful to some extent, are not a satisfactorily reliable measure of Cell Tech's value at the time of the Merger. Thus, while these post-Merger values should and will be considered as a "reality check" of any independently determined valuation of Cell Tech as of the Merger date, the discounted cash flow valuation methodology that both sides have used and endorsed is the approach that merits the greatest confidence.

The discounted cash flow valuation model is well-established and accepted in the financial community. Applied as of the Merger date, that methodology also best implements the Court's determination that any award of damages should reflect the Merger value Tad's would have been given had no fiduciary violations occurred. Moreover, that approach does *not* incorporate any values caused by unrelated, independent post-Merger events, and thereby avoids the risk that elements of rescissory damages might reappear through the back door.

The plaintiffs' cash flow projections, discounted at a rate of 17.7%, yield a valuation for Tad's of $3.9 million. The defendants' projections, discounted at a rate of 30%, result in a valuation of $833,000. The $3.1 million difference is largely attributable to the parties' differing assumptions about Cell Tech's revenue growth and what discount rate is appropriate. Those two disputed items are now addressed.

### (a) *Revenue Projections*

The parties' revenue projections as of the Merger date are depicted in the chart below:

| FY to Apr. 30 $000 | 1987 (Hist) | 1988 (Hist) | 1989 (Proj) | 1990 (Proj) | 1991 (Proj) | 1992 (Proj) | 1993 (Proj) |
|---|---|---|---|---|---|---|---|
| P's | 797 | 3,073 | 3,679 | 7,852 | 16,757 | 16,757 | 16,757 |
| D's | 797 | 3,073 | 4,608 | 6,912 | 9.677 | 13,548 | 16,257 |

In my view, the more credible cash flow projections are those advocated by the plaintiffs. I base that conclusion upon several facts that were known or readily apparent at the time of the Merger. First, Cell Tech, in the hands of Daryl Kollman, was worth at least of $1.33 million. That Kollman offered—and the Townsends rejected—$1.33 million only four months after the Merger, strongly evidences that neither Cell Tech's managers nor the Townsends believed that Cell Tech was worth as little as $833,000 as of the Merger date.

Second, at the time of the Merger, Kollman was Cell Tech's most likely buyer.

During the Townsends' periodic employment contract negotiations with Kollman, Kollman repeatedly expressed his dissatisfaction with the compensation structure of Cell Tech. (*See, e.g.*, Tr. at 564). Moreover, it is apparent that Kollman's continued management of Cell Tech was crucial to Cell Tech's continued success. Those circumstances created a foreseeable possibility (if not likelihood) that Kollman would offer to acquire Cell Tech. Indeed, the fact that only four months after the Merger Kollman offered to purchase Cell Tech, and only one year later the Townsends granted the Kollmans the $4.4 million option to buy Cell Tech, further supports the inference that the Townsends probably anticipated an eventual purchase of Cell Tech by the Kollmans before the Merger in May, 1988.

Third, and finally, in adopting the plaintiffs' projections I cannot ignore Cell Tech's actual performance. By the 1990 fiscal year, Cell Tech's annual sales were close to $10 million; by the time of the trial, they were running close to $40 million. (DX 57; PX 139). That performance is consistent with Daryl Kollman's prediction, expressed in a letter he wrote to the Townsends before the Merger, that Cell Tech had "been in the 'hard work, low profit' stage for the last three years ... [but had] just started the rapid growth phase which precedes the 'hang onto your hats' phase." (PX 15). For this reason as well, the defendants' highly conservative revenue projections for Cell Tech at the time of the Merger lack credibility.[25]

Accordingly, I adopt the plaintiffs' "total free cash flow" projections, which are as follows:

| FY to Apr. 30, $'000 | 1989 | 1990 | 1991 | Terminal Value, 1991 |
|---|---|---|---|---|
| Court | 290.9 | 169.3 | 361.3 | 5,390.4 |

### (b) *Discount Rate*

The other subject of the Cell Tech valuation dispute is the appropriate discount rate. On that issue, the defendants have the better side of the argument. Although both sides argue that their respective discount rates are supported by the Capital Asset Pricing Model ("CAPM"), their chosen rates differ vastly. The plaintiffs' discount rate is 17.7%; the defendants', 30%.

However, only the defendants have mathematically applied the CAPM to derive quantitatively the discount rate they propose.[26] Moreover, the plaintiffs' 17.7% discount rate relies heavily upon a highly questionable assessment of company-specific risk. In selecting their 30% rate, the plaintiffs' expert derived Cell Tech's beta, (which is a measurement of the risk of a particular company relative to the market) from the beta of a "comparable" company that represented an investment less risky than Cell Tech. The plaintiffs' expert relied primarily upon a New York Stock Exchange-traded company that had a beta of 2.2 and that owns and operates a national health food retail store chain and sells multiple health food products. The plaintiff's expert derived Cell Tech's beta of 2.0 from this "comparable" company's beta of 2.2, thereby suggesting that Cell Tech involved lower risk than did the "comparable" company. The comparison is factually unsupported. The plaintiffs have not persuaded this Court that their 17.7% discount rate is realistic.

---

**25.** The defendants also challenge of the plaintiffs' projections on the grounds that the plaintiffs failed to account for Kollman's profit participation and to subtract a debt owed by Cell Tech to its former owners, and that they also erroneously included a franchise fee in Cell Tech's profits. On that score I am satisfied that the plaintiffs have either proved the defendants' objections to be misguided, or have otherwise adequately explained the basis for their experts' choice of numbers. (Revised Post-Trial Reply Brief of Petitioners and Plaintiffs in the Consolidated Actions at 30–34).

**26.** The defendants calculated a discount rate of 26.5% using the CAPM. The defendants' expert explained that on the basis of his experience, he considers 30% to be more appropriate, given the risks associated with Cell Tech. Unlike the defendants, the plaintiffs never demonstrated how precisely they derived their discount rate from the CAPM.

I recognize that the defendants' 30% discount rate is unusually high, but the record demonstrates that Cell Tech, at the time of the Merger, was an unusually risky investment. Cell Tech faced regulatory, management, and "fad" product-related risks, any one of which could result in that company's failure. I find it entirely plausible that a prudent investor in a venture of that kind would demand an annual return in the 30% order of magnitude. Accordingly, I adopt 30% as the appropriate discount rate for valuing Cell Tech's projected future cash flows.

The plaintiffs' cash flow projections, discounted at the rate of 30%, yield a $2,923,720 net present value for Cell Tech as of the Merger date, which amount is the adjudicated value of Cell Tech for purposes of calculating damages.

### 4. EPG Damages

The plaintiffs also seek damages for the undervaluation of EPG, measured as their *pro rata* share of their expert's $2,390,000 valuation. Using a similar discounted cash flow methodology, the defendants' expert concluded that EPG should be valued at far less—$445,000.

Although I ultimately do not accept it, I find the defendants' expert's discounted cash flow valuation of EPG to be the more credible. First, the plaintiffs' expert assumed that EPG would realize annual 4% price increases for the power it produces. But EPG's prices are linked to coal prices, and at the time of the Merger, future coal prices were forecasted to be flat or falling. Accordingly, the defendants' assumed 1% growth rate is more realistic. Second, the plaintiffs' expert assumed fixed annual operating and maintenance fees of $45,000, even though that figure was based on EPG's experience when one of its two power generators was brand new. The defendants' estimate that these operating costs would rise to $60,000 per year is the more plausible. Finally, the higher rate of parasitic power consumption that the defendants' expert assumed is supported by the testimony of the plaintiffs' own expert. Without resolving each disputed detail of the two sets of projections, I am persuaded that the defendants' cash flow projections for EPG are the more accurate, and I accept them.

However, that does not end the analysis. Although I reject the plaintiffs' valuation of EPG, I cannot accept the defendants' lower valuation either, because it is significantly less than the value that the Tad's board approved in the Merger. To adopt a lower value would be inequitable. Given the adjudicated disloyalty of the directors, I find the $1,136,000 value they fixed for purposes of the Merger to be the lowest acceptable valuation of EPG for damages calculation purposes.

### 5. The Remaining Damage Claims

Finally, the plaintiffs urge the Court to include the value of several never-asserted derivative claims on behalf of Tad's for breach of fiduciary duty. These include claims against (i) Mr. Bressler, for representing the Townsends individually in connection with the consulting and non-competition agreements; (ii) the Townsends, for permitting Tad's to sell steaks, without any markup, to certain restaurants owned by the Townsends individually; and (iii) the Townsends, for authorizing Tad's to provide management services free of charge on behalf of Tad's Inc. of San Francisco, a company wholly-owned by Neal Townsend. All told, the plaintiffs value these claims at $1,617,000.

I find it unnecessary to address these unasserted fiduciary claims, because their asserted value is too speculative. That value assumes that the defendants are liable, with no discount being applied to take into account the potential defenses to these unasserted claims or to reflect the less-than-perfect probability of their success. Most important, the plaintiffs advanced no evidence to support their damage claims. They offer only unsupported assertions that are too speculative to form the basis for a damage award.

\* \* \*

Having independently valued Tad's, the Court is now able to determine the amount of the defendants' liability as of the date of the Merger. Because the plaintiffs

have sued individually rather than derivatively or on behalf of a shareholder class, any damages awarded to the plaintiffs must be proportionate to their approximately 5.5% stock ownership in Tad's. Accordingly, as of the Merger date, the plaintiffs' damages will be their proportionate share of the adjudicated value of Tad's. That adjudicated value is $23.86 per share,[27] which, when multiplied by the 31,600 Tad's shares owned by the Ryans, results in a total damages award of $753,976.

### 6. Interest, Costs and Attorneys' Fees

In addition to damages, the plaintiffs seek an award of 19% compound prejudgment interest, plus costs and attorneys' fees.

■ Interest is typically awarded on the basis of a combination of the plaintiffs' lost opportunity cost, measured by a prudent investor rate; and the benefit realized by the defendant, measured in terms of the reduction in defendants' borrowing costs. *Chang's Holdings, S.A. v. Universal Chemicals and Coatings,* Inc., C.A. No. 10856, Chandler, V.C., Mem.Op. at 2–3, 1994 WL 681091 (Nov. 22, 1994). Where the evidence is insufficient to enable the Court to balance these factors, however, the "legal interest rate serves as a useful default rate ..." for prejudgment interest. *Id.* at 6.

■ The plaintiffs claim that they are entitled to compound interest at a rate of 19%, because that rate of interest is what the defendants received on the notes executed by Kollman for the financed portion of the Cell Tech purchase price. But using the return to defendants from their investment in high yield notes as a basis, is inconsistent with the legal standard governing the determination of prejudgment interest.

The defendants point out that the actual interest earned on the plaintiffs' portion of the Merger consideration invested by Tad's represents an average return of 5.5% per year (not compounded). According to the defendants, that is some evidence of the

plaintiff's prudent investor rate. The defendants also contend that because they had substantial liquid assets and no debt following the Asset Sale and Merger, they had no need to "borrow" the plaintiff's portion of the Merger consideration, and hence, derived no benefit from continuing to hold it. I find that argument somewhat disingenuous. Even if Tad's was cash-rich after the Asset Sale and Merger, the defendants derived a benefit from having the use of the plaintiffs' funds at no cost. It therefore is appropriate that that benefit be considered in determining a fair interest rate during the period that the defendants had the cost-free use of plaintiffs' funds.

Given the parties' superficial treatment of the prejudgment interest date question, I conclude that they have failed adequately to develop the record on that subject. Accordingly, the Court adopts the legal interest rate as the appropriate rate of prejudgment interest. Because the plaintiffs have not established that the circumstances of this particular case warrants a departure from the normal practice of awarding simple interest (*Chang's Holdings* at 10), the prejudgment interest rate will be based on the simple interest rate of 11% that prevailed as of May, 1988. (Revised Opening Post–Trial Brief of Petitioners and Plaintiffs in the Consolidated Actions at 90).

■ However, because of the plaintiffs' excessive delay in prosecuting this case, an award for the entire six years at the 11% statutory rate would, in my view, constitute an undeserved windfall for the plaintiffs and an unjustified penalty for the defendants. *See, Wacht v. Continental Hosts, Ltd.,* Del. Ch., C.A. No. 7954, Chandler, V.C., Mem.Op. at 8 (Dec. 23, 1994). These actions could and should have been brought to trial in approximately one half to two-thirds the time that it actually took. To reflect that determination, I award prejudgment interest at two-thirds the 11% statutory rate of simple interest as of May 1988, *i.e.,* 7.33%.[28]

27. This total includes the $13.25 per share Merger price that the plaintiffs never received, because they did not tender their shares in the Merger.

28. Because the fiduciary duty breached by the defendants was the duty of loyalty, I err in the plaintiffs' favor by reducing the interest rate to two-thirds, rather than to one half, of the statuto-

The plaintiffs also seek, pursuant to 8 *Del.C.* § 262(j), an award of the litigation costs they incurred in bringing these proceedings, including fees for expert advice and trial testimony. Because the record does not disclose the amount of those costs, any award of costs must be separately determined in a later proceeding.

Finally, the plaintiffs seek attorneys fees on the basis that the defendants acted in bad faith and committed fraud against the minority stockholders, citing *Weinberger v. UOP, Inc.*, Del.Ch., 517 A.2d 653 at 656 (1986).

In these particular circumstances the only arguable basis for fee shifting would be that the defendants acted in bad faith, which is the argument plaintiffs advance here. Because the plaintiffs have sued individually and not representatively on behalf of the corporation or a shareholder class, the plaintiffs cannot recover fees on the basis of having created a "common fund" or conferred a "common benefit" to a larger class of shareholders.[29]

■ The difficulty, however, is that the facts do not support the plaintiffs' "bad faith" theory. Although the defendants have failed to carry their burden of showing entire fairness, that does not necessarily establish that the defendants acted in bad faith as that term is defined for fee-shifting purposes. The plaintiffs must carry the burden of persuading the Court that the defendants acted with *scienter* sufficient to warrant a finding of bad faith. For the Court to award attorneys fees on that basis, the conduct at issue must rise to a "high level of egregiousness." *Abex, Inc. v. Koll Real Estate Group, Inc.*, Del.Ch., C.A. No. 13452, Jacobs, V.C. (Dec. 22, 1994). The plaintiffs have failed to demonstrate that the defendants' conduct rises to the highly egregious level described in *Abex* and the decisions cited therein. That a fiduciary is found to have breached his duty cannot, without more, justify a fee-shifting award of attorney's fees against the fiduciary or the corporation. *Weinberger v. UOP, Inc.*, Del.Ch., 517 A.2d 653, 656 (1986). Otherwise, every adjudicated breach of fiduciary duty would automatically result in a fee award. In short, I find that the plaintiffs have failed to demonstrate wrongdoing of the kind that would justify fee-shifting.

## V. CONCLUSION

For the reasons previously set forth, judgment will be entered in favor of the plaintiffs and against the defendants in the amount of $753,976, plus prejudgment interest calculated at the rate of 7.33% from May 5, 1988 to the date of judgment, plus costs to be determined (in the absence of an agreement among the parties) in a later proceeding. Counsel shall confer and submit a form of order implementing the foregoing rulings.

---

ry rate. That result is significantly higher than the 5.5% rate advocated by defendants.

**29.** Nor do the plaintiffs come within the doctrine of *Tandycrafts, Inc. v. Initio Partners*, Del.Supr., 562 A.2d 1162 (1989) because no stockholder other than the plaintiffs has dissented from the Merger or sued. Accordingly, the only beneficiary of the judgment entered in this case would be the plaintiffs.