**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

JAMES WEI and YANXIN ZHANG,    )
   )
        Petitioners,    )
   )
      v.    )   C.A. No. 2020-1036-KSJM
   )
ZOOX, INC.,    )
   )
        Respondent.    )

**OPINION**

Date Submitted: October 14, 2021
Date Decided: January 31, 2022

Joel Friedlander, Jeffrey M. Gorris, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Randall J. Baron, David A. Knotts, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; *Counsel for Petitioners*.

David J. Teklits, Thomas P. Will, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; William D. Savitt, Anitha Reddy, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Respondent.*

**McCORMICK, C.**

The petitioners filed this appraisal proceeding to solve what their attorneys view as a problem—the lack of access to evidence necessary to ferret out actionable fiduciary duty claims challenging M&A transactions. Due to circumstances somewhat unique to the private company setting, the petitioners were blocked from pursuing what has become the usual path to obtaining such evidence—a demand to inspect books and records under Section 220 of the Delaware General Corporation Law. Knowing that Delaware law typically entitles appraisal petitioners to relatively broad discovery, the petitioners filed this action and served discovery requests seeking emails and other documents. The respondent objected to the requests and moved for a protective order.

The respondent's lead argument is that the petitioners' discovery requests are disproportionate to the needs of this case and should be reduced pursuant to Court of Chancery Rule 26. This decision rejects that argument, interpreting Rule 26's proportionality requirement in the appraisal context consistent with prior decisions of this court holding that the size of an appraisal petitioner's stake does not dictate the scope of discovery.

The respondent alternatively argues that policy considerations militate against granting an appraisal petitioner full discovery where the petitioner's clear purpose is to investigate a follow-on claim for breach of fiduciary duty. This decision accepts that argument, holding that the miniscule size of the petitioners' economic interests indicates that the real purpose of the petition is to facilitate a pre-suit investigation of a fiduciary duty claim. Invoking the court's broad discretion over the discovery process, this decision limits the petitioners to the information they could have obtained in a Section 220 action.

## I. FACTUAL BACKGROUND

Respondent Zoox, Inc. ("Respondent" or the "Company") is an automotive technology company that was founded in 2014 to develop self-driving cars for ride-hailing services.[1]  Under a merger agreement dated June 24, 2020, Amazon.com, Inc. agreed to acquire the Company for $1.3 billion.  On June 25, 2020, the holders of the Company's common and preferred stock approved the merger agreement by written consent.  On July 6, 2020, the Company issued an Information Statement to its stockholders estimating that the per-share merger consideration was $0.69 to $0.76.[2]

Petitioners James Wei and Yanxin Zhang (together, "Petitioners") owned Company common stock.  When the merger agreement was executed, Wei held 13,000 shares and Zhang held 29,166 shares.[3]  On July 23, 2020, Petitioners each served a demand for appraisal pursuant to 8 *Del. C.* § 262 for their shares of Company stock.

Petitioners later made inspection demands on the Company pursuant to 8 *Del. C.* § 220 to investigate possible wrongdoing in connection with the merger.[4]  The Section 220 demands identified 23 categories of books and records that Petitioners sought to inspect.[5]

---

[1] *See* C.A. No. 2020-1036-KSJM, Docket ("Dkt.") 1, Verified Pet. for Appraisal ("Pet."); Dkt. 13 ("Mot.") Ex. 1 at 7.  Unless otherwise stated, the facts described herein are drawn from the Petition.

[2] *See* Mot. Ex. 1 at 14.

[3] *See* Pet. Ex. A.

[4] *See* Mot. Ex. 6; Mot. Ex. 7.

[5] *See* Mot. Ex. 6 at 2–5, 11.

Section 220 grants a corporation five business days to respond to a Section 220 demand. The merger closed before that five-day period expired.[6] On August 12, 2020, the Company informed Petitioners that the merger had closed and that, by operation of the merger, Petitioners no longer had standing to inspect documents under Section 220.[7]

The next day, Petitioners filed a complaint in this court to enforce their inspection rights under Section 220 (the "Section 220 Action").[8]

On October 9, 2020, Petitioners withdrew their appraisal demands as to more than 95% of their collective shares. Each continued to demand appraisal as to 1,000 of their shares, leaving 2,000 shares total subject to appraisal. The 2,000 shares are worth less than $2,000 at the merger price. Petitioners argue that their shares are worth more.[9] Even accepting Petitioners' allegations as true, it is unlikely that their stock is worth more than $20,000, which is ten times the merger consideration.[10]

---

[6] It appears that Petitioners attempted to serve Section 220 demands on the Company at its offices on August 4, 2020, and an individual at the office refused to accept service. *See* Dkt. 20 ("Opp'n") Ex. I. The parties debate whether the Company thereby attempted to "evade service" of the Section 220 demands. *See* Opp'n ¶ 15; Dkt. 23 ("Reply") ¶ 7. The parties' debate is irrelevant because, regardless of whether the Company was served on August 4 or August 5, less than five business days passed between service and the closing of the merger on Monday, August 10.

[7] *See* Mot. Ex. 7.

[8] *See* C.A. No. 2020-0666-PAF (Section 220 Action), Dkt. 1.

[9] *See* Mot. Ex. 8 ¶¶ 15, 21.

[10] Petitioners appear to dispute this calculation, claiming that the amount in controversy could be "hundreds of millions of dollars," Opp'n ¶ 2, but that number seems based on a hypothetical future class action and not the shares subject to appraisal. *See* Reply ¶ 6.

3

Petitioners filed this action on December 7, 2020, and voluntarily dismissed the Section 220 Action three days later.[11] The notice of voluntary dismissal noted Petitioners' belief that, in this appraisal action, they "would be entitled, at a minimum, to discovery of the same material sought" in the Section 220 Action.[12]

Petitioners served requests for documents on Respondent on January 15, 2021.[13] The requests sought 53 categories of documents encompassing the 23 categories in Petitioners' Section 220 demands.[14]

In response to Petitioners' discovery requests, Respondent produced the documents referred to as "Formal Board Materials" in the Section 220 context.[15] Respondent's production included all board-level materials concerning the Company's valuation and financial performance, the Amazon deal, alternative transactions, all non-disclosure agreements entered into with any potential counterparties to an alternative transaction, and a waterfall analysis of the liquidation preferences of the various classes of Zoox

---

[11] *See* Section 220 Action, Dkt. 18.

[12] *Id.*

[13] *See* Mot. Ex. 12.

[14] *Compare* Mot. Ex. 6 at 2–5 (categories 1–23), *with* Mot. Ex. 12 at 2, 5–10 (categories 1, 22, 29–47).

[15] *See Lebanon Cty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at \*24 (Del. Ch. Jan. 13, 2020) (explaining that an adequate inspection is often limited to "Formal Board Materials," defined as "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered").

stockholders, updated as of July 31, 2019.[16]  After oral argument, Respondent prepared and delivered to Petitioners a waterfall analysis updated as of closing.[17]

Respondent objected to producing emails or other electronically stored information. Petitioners' counsel then proposed protocols narrowing their discovery demands, requesting that Respondent search the electronic files of only three custodians over a fifteen-month period.[18]  Respondent nevertheless estimates that such protocols would generate vendor costs ranging from approximately $50,000 to $130,000.[19]

Respondent moved for a protective order on June 25, 2021.  The court held oral argument on October 14, 2021.

## II.    LEGAL ANALYSIS

The court has broad discretion in determining the scope of discovery.[20]  Respondent urges the court to exercise that discretion here to protect it from further discovery.

---

[16] *See* Dkt. 38 ("Oral Arg. Tr.") at 10:18–11:1; Dkt. 39.

[17] *See* Dkt. 39.

[18] *See* Oral Arg. Tr. at 39:5–7.

[19] *See* Mot. Ex. 20; Mot. Ex. 21.  Petitioners argue that this cost can be reduced to under $20,000 if the parties enter into a quick peek stipulation.  *See* Oral Arg. Tr. at 40:2–22. Generally speaking, however, the proponent of discovery is less suited to estimate the costs of responding to discovery than the party tasked with responding, and the court credits Respondent's calculations for that reason.

[20] *See, e.g.*, *Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1061 (Del. 1986) (stating that "[t]he application of the discovery rules is subject to the exercise of the trial court's sound discretion"); *Fish Eng'g Corp. v. Hutchinson*, 162 A.2d 722, 725 (Del. 1960) (stating that "[t]he Court [of Chancery] has broad discretion in determining whether or not to allow discovery"); *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2019 WL 2613277, at *1 (Del. Ch. June 26, 2019) (stating that "[t]his Court has broad discretion in managing discovery and evidentiary hearings in proceedings before it"); *Grunstein v. Silva*, 2009 WL 4698541, at *20 n.137 (Del. Ch. Dec. 8, 2009) (noting that the court "has broad discretion

5

Respondent's lead argument is that Petitioners' discovery requests violate the proportionality requirement of Court of Chancery Rule 26. Respondent further argues that Petitioners' sole purpose in this appraisal action is to obtain discovery to support a follow-on claim for breach of fiduciary duty and that policy considerations weigh against permitting appraisal actions for this purpose.

This decision rejects Respondent's arguments under the proportionality requirement and then turns to the thornier policy questions raised by Respondent.

### A. Under Established Precedent, The Proportionality Principle Does Not Limit The Scope Of Discovery.

Respondent argues that Petitioners' discovery demands are "massively disproportionate to" the value of this litigation.[21] Respondent has demonstrated that Petitioners' discovery demands will result in costs in excess of $50,000.[22] Respondent has

---

to facilitate and control the course of discovery"); *Sokol Hldgs., Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *9 (Del. Ch. Aug. 5, 2009) (stating that "the application of [Rule 26's] limitation[s] rests in the sound discretion of this court"); *Rohm & Haas Co. v. Dow Chem. Co.*, 2009 WL 537193, at *1 (Del. Ch. Feb. 19, 2009) (stating that "[t]he Court of Chancery . . . has broad discretion under Court of Chancery Rule [26] to determine the scope of discovery"); *In re Tyson Foods, Inc.*, 2007 WL 2685011, at *1 (Del. Ch. Sept. 11, 2007) (stating that "[t]he scope of discovery is . . . squarely within the sound discretion of this Court"); *Sutherland v. Sutherland*, 2007 WL 1954444, at *3 (Del. Ch. July 2, 2007) (stating that "the inherent equitable discretion of the Court of Chancery" grants the court the power "to tailor discovery to a given set of facts"); *NiSource Cap. Mkts., Inc. v. Columbia Energy Gp.*, 1999 WL 959183, at *1 (Del. Ch. Sept. 24, 1999) (stating that "this Court has previously held that the application of the discovery rules is subject to the exercise of the Court's sound discretion"); *Miles v. Cookson*, 677 A.2d 507, 508 (Del. Ch. 1995) (stating that "[d]iscovery is subject to the exercise of the sound discretion of the Court of Chancery").

[21] Mot. ¶ 33.

[22] *See* Reply Ex. 20; Reply Ex. 21.

6

persuasively argued that Petitioners' shares will appraise for no more than $20,000 in the aggregate if Petitioners are entirely successful in this proceeding.[23]  Because the costs of discovery exceed the amount in controversy, Respondent contends that Petitioners' discovery requests run afoul of the proportionality requirement of Rule 26.

Petitioners respond that this court has repeatedly eschewed attempts to limit the scope of discovery in an appraisal proceeding based on the size of the petitioner's stake. Petitioners also point out that the 2019 amendment to Rule 26, which expressly adopted the principle of proportionality, did not alter this line of authority.

For the purpose of addressing Respondent's argument under Rule 26, the court assumes that Petitioners actually seek to appraise their shares and addresses whether the proportionality requirement alone should limit the scope of discovery in an appraisal based on the size of the petitioner's stake.  Under established precedent, it does not.

Generally, this court construes the scope of discovery permitted under Rule 26 liberally in favor of the free exchange of information,[24] even in a statutory appraisal proceeding.[25]

---

[23] *See* Mot. ¶ 34.

[24] *See, e.g.*, *Hamilton P'rs, L.P. v. Highland Cap. Mgmt., L.P.*, 2016 WL 612233, at *2 (Del. Ch. Feb. 2, 2016) (stating that the scope of permissible discovery is broad and far-reaching, and therefore litigants may seek "irrelevant information that is reasonably likely to uncover relevant information"); *Pfizer Inc. v. Warner-Lambert Co.*, 1999 WL 33236240, at *1 (Del. Ch. Dec. 8, 1999) (stating that "absent injustice or privilege, [Rule 26] instructs the court to grant discovery liberally").

[25] *See In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 548 (Del. Ch. 2014) (stating that "[e]ven in a statutory appraisal proceeding, 'the rules of discovery should [] be

Rule 26 was amended in 2019 to expressly include a requirement that discovery be proportionate to what is at stake in the litigation. As amended, Rule 26 provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and *proportional to the needs of the case*."[26]

Amended Rule 26 also lists six factors to consider when determining whether the discovery sought is proportional to the needs of the case, providing that

> The frequency or extent of use of the discovery methods . . . shall be limited by the Court if it determines that . . . the discovery sought is not proportional to the needs of the case, considering [i] the importance of the issues at stake in the action, [ii] the amount in controversy, [iii] the parties' relative access to relevant information, [iv] the parties' resources, [v] the importance of the discovery in resolving the issues, and [vi] whether the burden or expense of the proposed discovery outweighs its likely benefit.[27]

Rule 26 already contained most of these six factors before the amendment. The amendment added "relative access to information" and the balance of the "burden or expense of the proposed discovery" against "its likely benefit."[28]

---

construed liberally'" (quoting *Bershad v. Curtiss-Wright Corp.*, 1983 WL 10916, at *7 (Del. Ch. Mar. 21, 1983))).

[26] Ct. Ch. R. 26(b)(1) (emphasis added).

[27] *Id.*

[28] *Compare* Ct. Ch. R. 26(b)(1) (2013) (providing that "the frequency or extent of use of the discovery methods . . . shall be limited by the Court if it determines that . . . the discovery is unduly burdensome or expensive, taking into account [i] the needs of the case, [ii] the amount in controversy, [iii] limitations on the parties' resources, and [iv] the importance of the issues at stake in the litigation"), *with* Ct. Ch. R. 26(b)(1) (2019) (providing that "the frequency or extent of use of the discovery methods . . . shall be limited by the Court if it determines that . . . the discovery sought is not proportional to the needs of the case, considering [i] the importance of the issues at stake in the action, [ii] the amount

Before the 2019 amendment, this court repeatedly held that the size of an appraisal petitioner's holdings did not determine the scope of discovery in appraisal proceedings. The seminal case on this point is *Kaye v. Pantone, Inc.*, where the appraisal petitioner sought an order compelling the respondent corporation to produce discovery.[29] The corporation objected on the basis that the discovery request was unduly burdensome in light of the petitioner's 18,000-share interest, which was worth $18,000 at the deal price.[30] Although $18,000 was more valuable in 1981 than the present day, the respondent still argued compellingly that the cost of discovery exceeded the amount in controversy.

The court overruled the respondent's objection, holding that there was no statutory requirement "that a stockholder own a certain percentage of shares or have a large monetary interest in order to utilize his statutory right of appraisal."[31] The court emphasized the limited statutory requirements imposed on appraisal petitioners, observing that appraisal is available to "*any* stockholder who has complied with" Section 262's procedural requirements.[32]

---

in controversy, [iii] *the parties' relative access to relevant information*, [iv] the parties' resources, [v] the importance of the discovery in resolving the issues, and [vi] *whether the burden or expense of the proposed discovery outweighs its likely benefit*" (emphasis added)).

[29] 1981 WL 15072, at *1 (Del. Ch. Oct. 6, 1981).

[30] *See id.*

[31] *Id.*

[32] *Id.* (emphasis in original) (quoting 8 *Del. C.* § 262(a)).

The reasoning of *Kaye* still holds. The court's obligation in an appraisal proceeding is to value the corporation itself, "tak[ing] into account all relevant factors."[33] This statutory mandate applies regardless of the size of the petitioner's stake. To adequately fulfill its mandate, this court typically conducts a "detailed investigation" into the operative reality of the entity at the time of the merger and, under current law, into the sale process that led to the transaction.[34] To aid in its statutory function, the court allows discovery as to this information regardless of the size of the petitioner's holdings.[35]

The 2019 amendment does not demand a different rule. Most viewed proportionality as an implicit consideration before the 2019 amendment.[36] The comment

---

[33] 8 *Del. C.* § 262(h); *see also Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *8 (Del. Ch. Feb. 22, 1988) (holding that the size of a stockholder's stake is not relevant to the valuation analysis, except to ascertain the fraction of the value attributable to the petitioner's shares, because the court's task in an appraisal proceeding is "to value the *corporation* itself, as distinguished from a specific fraction of its *shares* as they may exist in the hands of a particular shareholder" (emphasis in original)).

[34] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187 n.8 (Del. 1988) (citation omitted).

[35] *See also Banela Corp. v. VelQuest Corp.*, C.A. No. 7459-VCL, at 28 (Del. Ch. Jan. 15, 2013) (TRANSCRIPT) (Laster, V.C.) (granting appraisal petitioner's motion to compel; observing that "the discovery burden is disproportionate in an appraisal case" and that "[w]e've been told by precedent that the size of a petitioner's appraisal stake isn't relevant to his or her access to discovery, so the ability to get all discovery is the same"); *Dorno Inv. P'rs, LLC v. Onyx Pharms., Inc.*, C.A. No. 9000-CB, at 29 (Del. Ch. June 16, 2014) (TRANSCRIPT) (Bouchard, C.) (granting appraisal petitioner's motion to compel; questioning the relevance of the amount in controversy in an appraisal proceeding and asking whether "there's one level of justice if you have a really big position but another level of justice if your position is small?").

[36] *See, e.g.*, Lewis H. Lazarus & Katherine J. Neikirk, *Litigating in the Court of Chancery*, 31 DEL. LAW. 16, 17 (2013) (noting that the "Court of Chancery appreciates the costs of modern discovery and believes that those costs should be proportionate to the amount at stake in the litigation."); *Delmarva Drilling Co. v. Am. Water Well Sys., Inc.*, 1988 WL 7396, at *2 (Del. Ch. Jan. 26, 1988) (noting that Rule 26 had recently been amended to be

to the 2019 amendment describes the amendment as a "clarification" that "is not intended to change the scope of available discovery under the Delaware rules."[37]  Indeed, this court conducted proportionality analyses in response to discovery motions prior to the 2019 amendment.[38]  The 2019 amendment did not dramatically alter Delaware law.

Moreover, a party's financial stake is not dispositive in a Rule 26 proportionality analysis.  It is true that courts and litigants often focus on the "amount in controversy" factor when assessing proportionality because it provides a comparatively objective anchor.  The "amount in controversy," however, is but one of six enumerated factors of Rule 26.[39]  Courts must also consider "the importance of the issues at stake in the action."[40]

---

identical to its federal analog, the comment to which described the purpose of "guard[ing] against redundant or disproportionate discovery" (citing Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment)); *see also Pepsico, Inc. v. Pepsi-Cola Bottling Co. of Asbury Park*, 261 A.2d 520, 521 (Del. 1969) (positing that discovery could be so burdensome and "disproportionate to the amount in controversy as to amount to deprivation of due process").

[37] Ct. Ch. R. 26(b)(1), cmt. to 2019 amendment.

[38] *See, e.g.*, *Chatham Asset Mgmt., LLC v. Papanier*, C.A. No. 2017-0088-AGB, at 59 (Del. Ch. Apr. 5, 2018) (TRANSCRIPT) (Bouchard, C.) (instructing, before the 2019 amendment, that an appraisal petitioner "should bear in mind that discovery here must be proportional to what is at stake" and describing the proportionality principle as "a headline point now embedded explicitly in the federal rules, but it has always been implicit in the Court of Chancery rules, as well").

[39] Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (cautioning that that "the monetary stakes are only one factor, to be balanced against the other factors").

[40] *Id.* (observing that the factors provide breathing room for "litigation that seeks relatively small amounts of money, or no money at all, but that seeks to vindicate vitally important personal or public values").  Court of Chancery Rule 26 and its federal counterpart are almost identical, except that this court's rule is framed as an instruction to the court to limit discovery if it finds that the discovery sought is *not* proportional to the needs of the case. *Compare* Ct. Ch. R. 26(b)(1) (providing that the "frequency or extent of use of the discovery methods . . . shall be limited by the Court if it determines that" either the

11

Here, the General Assembly has mandated that the court perform an appraisal function regardless of the size of a petitioner's stake. The "issues at stake" factor is thus paramount in the proportionality analysis.

For these reasons, I decline to exercise my discretion to limit the scope of discovery in this action based solely on the proportionality principles of Rule 26.

## B. Policy Considerations Militate In Favor Of Limiting Petitioners To Those Documents Necessary And Sufficient To Pursue Their Claims.

Respondent argues that, given the exceedingly small financial benefit Petitioners stand to gain through this proceeding, the only reasonable conclusion is that Petitioners are pursuing appraisal to discover evidence relevant to a future claim for breach of fiduciary duty.[41] Respondent contends that Petitioners' actions run afoul of the well-established principle of Delaware law that a litigant is not entitled to conduct discovery for the purpose of developing new causes of action.

Petitioners deny pursuing this appraisal proceeding for the sole purpose of investigating claims for breach of fiduciary duty. Petitioners do not deny, however, that information gathering is among their aims. They contend that Delaware law permits appraisal petitioners to use appraisal discovery to evaluate potential claims for breach of fiduciary duty.

---

discovery sought is unreasonably cumulative, duplicative, or disproportionate or the party seeking the discovery has had ample opportunity to obtain the information sought), *with* Fed. R. Civ. P. 26(b)(1) (outlining the scope of discovery unless otherwise limited by court order). The substantial identity between the rules makes it appropriate to look to federal precedent.

[41] Mot. ¶ 42.

To address the competing policy issues, it is helpful to assume that the Petitioners' only purpose is to investigate potential claims for breach of fiduciary duty. As shorthand, this decision refers to this purpose as the "pre-suit investigation" purpose. Ordinarily, a stockholder that wishes to conduct a pre-suit investigation uses Section 220 of the DGCL. The policy issue that Respondent has raised implicates the interrelationship between Section 220 and Section 262.

### 1. Section 220

Generally speaking, a plaintiff may not file a lawsuit and seek discovery for the sole purpose of investigating claims to pursue in future lawsuits.[42] A books-and-records action filed pursuant to Section 220 of the DGCL is an exception to that rule. Delaware law recognizes that seeking to investigate possible fiduciary misconduct is a proper purpose for inspecting books and records.[43] Over the years, the Delaware judiciary has repeatedly exhorted stockholders to use this "tool at hand" to conduct pre-suit investigations.[44]

---

[42] *See Dann v. Chrysler Corp.*, 166 A.2d 431, 433 (Del. Ch. 1960) (Seitz, C.) (denying a motion to compel documents sought for the purpose of determining whether additional persons should be "the subject of corporate action by litigation or otherwise," and holding that "plaintiffs are not entitled to discovery for the purpose of attempting to discover 'new' causes of action").

[43] *See, e.g.*, *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

[44] *See, e.g.*, *Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) (observing that plaintiffs "have many avenues available to obtain information bearing on the subject of their claims" but that "[s]urprisingly, little use has been made of section 220 as an information-gathering tool in the derivative context"); *Grimes v. Donald*, 673 A.2d 1207, 1216 & n.11 (Del. 1996) (observing that plaintiffs are capable of "using the 'tools at hand' to obtain the necessary information before filing a derivative action"), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *White v. Panic*, 793 A.2d 356, 364 (Del. Ch. 2000) (declaring that, because the stockholder plaintiff in a derivative suit did not conduct a pre-suit investigation using Section 220, the court would "not give a broad reading to the facts

Historically, the exhortation to use Section 220 focused on derivative claims, but "the direction is equally applicable to stockholders who intend to file class action suits challenging transactions approved by a shareholder vote."[45] Accordingly, this court has permitted stockholders to use Section 220 to investigate potential wrongdoing in connection with M&A transactions. Although this practice was prevalent to some degree over the past few decades,[46] it gained greater significance after *Corwin*, as Vice Chancellor Slights observed in *Lavin v. West Corp.*[47]

In *Lavin*, a stockholder filed an enforcement action under Section 220 seeking to investigate possible wrongdoing in connection with a merger, arguing that the directors and officers may have breached their fiduciary duties by favoring a sale of the company as

alleged in the complaint, nor . . . infer from them the existence of other facts that would have been proved or disproved by a further presuit investigation"); *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *1 (Del. Ch. June 5, 2003) (stating that "this court and the Delaware Supreme Court have been urging would-be derivative plaintiffs to use the 'tools at hand' before filing complaints"); *AmerisourceBergen Corp. v. Lebanon Cty. Empls.' Ret. Fund*, 243 A.3d 417, 426 (Del. 2020) (stating that "[f]or over a quarter-century, this Court has repeatedly encouraged stockholders suspicious of a corporation's management or operations to exercise this right to obtain the information necessary to meet the particularization requirements that are applicable in derivative litigation").

[45] *Lavin v. W. Corp.*, 2017 WL 6728702, at *9 (Del. Ch. Dec. 29, 2017).

[46] *See, e.g.*, *Loral Space Commc'ns, Inc. v. Highland Crusader Offshore P'rs, L.P.*, 977 A.2d 867, 868 (Del. 2009) (observing that one of the plaintiffs used books and records obtained pursuant to a Section 220 demand to file direct litigation after the challenged transaction closed); *Compaq Comput. Corp. v. Horton*, 631 A.2d 1, 4 (Del. 1993) (allowing Section 220 claims to proceed for the purpose of soliciting other stockholders to participate in class action litigation against the defendant corporation).

[47] *See Lavin*, 2017 WL 6728702, at *9.

a whole rather than in parts. The company argued that the plaintiff lacked a proper purpose because the claims it sought to investigate would be subject to dismissal under *Corwin*.[48]

Vice Chancellor Slights rejected the company's effort to bring the *Corwin* defense into a Section 220 proceeding. Likening the burden of pleading disclosure deficiencies under *Corwin* to the heightened pleading standard of Rule 23.1, the Vice Chancellor observed that "it would be naïve to believe," in most cases, "that the stockholder plaintiff will not face significant challenges to meet her pleading burden in anticipation of a *Corwin* defense if all she has in hand to prepare her complaint are the public filings of the company whose board of directors she proposes to sue."[49] The need for stockholders to determine whether a suit was warranted provided "precisely the reason this court should encourage stockholders, if feasible, to demand books and records before filing their complaints when they have a credible basis to suspect wrongdoing in connection with a stockholder-approved transaction and good reason to predict that a *Corwin* defense is forthcoming."[50]

Since *Lavin*, this court's decisions have permitted inspection of books and records to meet pleading-stage burdens in direct claims challenging M&A transactions.[51]

---

[48] *See id.* at *7.

[49] *Id.* at *9.

[50] *Id.*

[51] *See, e.g.*, *Donnelly v. Keryx Biopharms., Inc.*, 2019 WL 5446015, at *4–6 (Del. Ch. Oct. 24, 2019) (Glasscock, V.C.) (ordering inspection to investigate possible wrongdoing in connection with a merger transaction); *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *15–16 (Del. Ch. Jan. 25, 2019) (Zurn, V.C.) (citing *Lavin* and ordering inspection into possible wrongdoing in connection with a merger transaction); *Bucks Cty. Empls. Ret. Fund v. CBS Corp.*, 2019 WL 6311106, at *8–9 (Del. Ch. Nov. 25, 2019) (Slights, V.C.) (ordering inspection into possible wrongdoing in

15

Unsurprisingly, pre-suit investigations under Section 220 have improved outcomes for stockholder plaintiffs in subsequent fiduciary litigation.[52]

Of course, Section 220 presents timing challenges unique to the M&A context. Section 220 requires that a stockholder own stock at the time of filing its enforcement action.[53] Thus, when a transaction will extinguish the stockholder's ownership interest, the stockholder must file her enforcement action before the transaction closes.[54] Section 220 also requires a stockholder to wait five business days after serving a demand for inspection before filing an inspection action,[55] and this requirement has been interpreted as jurisdictional.[56] A stockholder therefore must serve an inspection demand at least five business days in advance of the transaction closing to preserve standing.

---

connection with an upcoming merger transaction); *Kosinski v. GGP Inc.*, 214 A.3d 944, 953–56 (Del. Ch. 2019) (ordering inspection into potential wrongdoing where an *MFW* defense was anticipated) (McCormick, V.C.).

[52] *See* James D. Cox et al., *The Paradox of Delaware's "Tools at Hand" Doctrine: An Empirical Investigation*, 75 BUS. LAW. 2123, 2139–44 (2020) (discussing the role of Section 220 in improving stockholder actions challenging M&A transactions); Joel Edan Friedlander, *Confronting the Problem of Fraud on the Board*, 75 BUS. LAW. 1441, 1472–76 (2019) (discussing the use of Section 220 in the M&A context generally and the beneficial effects of a Section 220 action in the *Fresh Market* litigation).

[53] *See* 8 *Del. C.* § 220(c)(1).

[54] *See Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *5 (Del. Ch. Feb. 27, 2017).

[55] *See* 8 *Del. C.* § 220(c); *see also MaD Invs. GRMD, LLC v. GR Cos., Inc.*, 2020 WL 6306028, at *5 (Del. Ch. Oct. 28, 2020) (interpreting the five-business-day rule as precluding the stockholder from filing an enforcement action before the sixth business day after filing the demand).

[56] *See Weisman v. Plains Res., Inc.*, 1989 WL 57714, at *1 (Del. Ch. June 1, 1989) (citing *Levy v. Recognition Equip. Co., Inc.*, 1982 WL 17877, at *1 (Del. Ch. Feb. 26, 1982))).

The stockholder-standing requirement and the five-day rule make Section 220 an imperfect tool for investigating acquisitions of private companies. While federal securities laws ensure that stockholders of public companies have a window of time after notice of impending M&A transactions to pursue a books-and-records action,[57] nothing prohibits private companies from agreeing to close on a shorter timeline.

Moreover, Section 220 entitles stockholders to a relatively limited scope of information. Delaware case law has held that the scope of inspection is limited to those documents necessary to satisfy the stockholder's stated purpose.[58] "Documents are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[59] The burden of proving what documents meet this requirement falls on the stockholder demanding inspection.[60]

---

[57] *See* 17 C.F.R. § 240.14c-2 (2022) (requiring that consent solicitations be sent at least 20 calendar days before the earliest date on which corporate action may be taken); *see also* 15 U.S.C. § 18a (imposing a premerger notification and waiting period for large entities and transactions under the Hart-Scott-Rodino Act); 16 C.F.R. § 801.30 (2022) (describing the waiting period and notification requirements for tender offers and the acquisition of voting securities and non-corporate interests from third parties); 17 C.F.R. § 249.308 (2022) (describing the matters to be disclosed on SEC Form 8-K).

[58] *See, e.g.*, *Cook v. Hewlett-Packard Co.*, 2014 WL 311111, at *3 (Del. Ch. Jan. 30, 2014).

[59] *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Tr. Fund*, 95 A.3d 1264, 1272 (Del. 2014) (quoting *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371–72 (Del. 2011)).

[60] *See, e.g.*, *Sec. First Corp. v. U.S. Die Casting & Dev. Co.,* 687 A.2d 563, 569 (Del. 1997).

When interpreting the scope of inspection under Section 220, the court must "balance the interests of the stockholder and the corporation."[61] Consequently, the scope of a Section 220 inspection is inevitably narrower than what a litigant might receive in plenary litigation.[62] Although Section 220 plaintiffs can obtain emails if they demonstrate that inspecting such information is necessary to their stated purpose, inspection is frequently limited to board-level documents that formally evidence the directors' deliberations and decisions.[63]

### 2. Section 262

Aspects of appraisal proceedings pursuant to Section 262 render them particularly effective information-gathering tools. Discovery in an appraisal action is almost guaranteed because procedural vehicles for early case resolution are "essentially foreign to

---

[61] *Amalgamated Bank v. Yahoo!, Inc.*, 132 A.3d 752, 789 (Del. Ch. 2016) (citing *Sec. First Corp.*, 687 A.2d at 569); *see* 8 *Del. C.* § 141(a).

[62] *See Carapico v. Phila. Stock Exch. Inc.*, 791 A.2d 787, 792 n.13 (Del. Ch. 2000).

[63] *See AmerisourceBergen*, 2020 WL 132752 at *24; *Gross v. Biogen Inc.*, 2021 WL 1399282, at *16 (Del. Ch. Apr. 14, 2021) (limiting inspection of certain categories of documents to formal board materials); *Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *9–10 (Del. Ch. Feb. 25, 2021) (same); *Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 897–902 (Del. Ch. 2020) (same); *see also Alexandria Venture Invs., LLC v. Verseau Therapeutics, Inc.*, 2020 WL 7422068, at *13 (Del. Ch. Dec. 18, 2020) (ordering inspection but deferring judgment on the inspection of materials beyond formal board materials).

statutory appraisal litigation."[64]  Thus, appraisal proceedings are "likely to go to trial."[65]

Further, as discussed above, discovery in appraisal proceedings is liberally construed in accordance with Rule 26.

In 1988, the Delaware Supreme Court issued *Cede & Co. v. Technicolor, Inc.*, imbuing appraisal proceedings with greater significance as information-gathering tools.[66] There, the high court allowed stockholders to use discovery adduced in appraisal proceedings to assert follow-on claims for breach of fiduciary duty.

In *Cede*, the appraisal petitioners claimed that they were not paid a fair value for their stock in a leveraged buyout of Technicolor, Inc.  Discovery in the appraisal action proceeded for two years before the petitioners uncovered "facts that suggested fraud, illegality, and unfair dealing by Technicolor and the [acquirer's] architects of the merger."[67]  With this discovery, one of the petitioners, Cinerama, Inc., filed a second suit alleging fraud and unfair dealing.  The defendants moved to dismiss, arguing that Cinerama had already elected to appraise its shares and could not simultaneously pursue an action for fraud arising out of the same merger.

---

[64] Lawrence A. Hamermesh & Michael L. Wachter, *The Importance of Being Dismissive: The Efficiency Role of Pleading Stage Evaluation of Shareholder Litigation*, 42 J. CORP. L. 597, 648 (2017); *see also* Charles Korsmo & Minor Myers, *Reforming Modern Appraisal Litigation*, 41 DEL. J. CORP. L. 279, 297 (2017) (observing that "[t]here are no conventional bases for moving to dismiss an appraisal petition or moving for summary judgment, aside from narrow technical questions about the eligibility of particular petitioners to seek appraisal").

[65] Korsmo & Myers, *supra* note 64, at 297.

[66] 542 A.2d 1182 (Del. 1988).

[67] *Id.* at 1185.

The Court of Chancery rejected the defendants' argument, and the Delaware Supreme Court affirmed on appeal. In reaching this conclusion, the Supreme Court identified one benefit of appraisal proceedings as their ability to uncover fiduciary misconduct. The high court further identified "policy considerations" that "militate against foreclosing a shareholder electing appraisal rights from later bringing a fraud action based on after-discovered wrongdoing in the merger."[68]

While the court in *Cede* presented the policy considerations in a unified discussion, two discrete themes emerged. The court's first concern was that appraisal proceedings were the *exclusive* means of pre-suit investigation in that "*only* shareholders pursuing discovery during an appraisal proceeding are likely to acquire the relevant information needed to pursue a fraud action if such information exists."[69] The court's second concern was that it would be inequitable "to bar those seeking appraisal from asserting a later-discovered fraud claim" because doing so would "effectively immunize a controlling shareholder from answering to a fraud claim."[70]

Since *Cede*, this court has routinely allowed petitioners to use discovery adduced in appraisal proceedings to assert or support claims for breach of fiduciary duty.[71] This court

---

[68] *Id.* at 1188.

[69] *Id.* at 1189 (emphasis added).

[70] *Id.*; *see also* Hideki Kanda & Saul Levmore, *The Appraisal Remedy and the Goals of Corporate Law*, 32 UCLA L. REV. 429, 473 (1985) (arguing that discovery is the worthiest goal of an appraisal proceeding).

[71] *See, e.g.*, *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *10 (Del. Ch. Feb. 11, 2015) (observing that the plaintiffs filed their fiduciary duty action after taking discovery in a prior appraisal action); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d

20

has also sustained challenges under Court of Chancery Rule 5.1 and modified confidentiality orders to allow appraisal discovery to be used for this purpose.[72]

No Delaware court has yet confronted the precise issue presented by Respondent's motion—whether an appraisal petitioner may obtain full discovery in an appraisal proceeding where the proceeding was commenced for the purpose of pre-suit investigation.

Relying on *Cede*, Petitioners urge the court to extend the law in this direction. In addressing this argument, it is worth asking whether the policy justifications for *Cede* apply in this circumstance.

The first policy consideration identified in *Cede* was that appraisal proceedings were an exclusive means of pre-suit investigation.[73] This concern no longer rings true in view of legal developments rendering Section 220 more muscular in the M&A context, at least outside of the private-company predicament in which Petitioners found themselves.

---

1, 16 (Del. Ch. 2014) (same); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *4 (Del. Ch. July 24, 2009) (same); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 355–56 (Del. Ch. 2008) (same); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1164 (Del. Ch. 1999) (same); *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 685 (Del. Ch. 1996) (same).

[72] *See In re Columbia Pipeline Gp., Inc.*, 2018 WL 4182207, at *5 (Del. Ch. Aug. 30, 2018) (sustaining a Rule 5.1 challenge to confidential treatment of certain filings to permit the petitioners to use the materials in other litigation); *Harris v. Harris FRC Corp.*, 2021 WL 57021, at *3 (Del. Ch. Jan. 7, 2021) (modifying a confidentiality order to permit an appraisal petitioner to use discovery in a follow-on fiduciary action, reasoning that the "Company was on notice that discovery in the appraisal proceeding could be used at a later date to assert plenary claims").

[73] *See Cede*, 542 A.2d at 1189.

The secondary policy consideration identified in *Cede* was that fiduciaries might escape wrongdoing ferreted out through appraisal discovery. This concern too seems less pronounced in light of the increased use of Section 220 in the M&A context as a means to investigate possible wrongdoing. Also, turning appraisal into a type of pre-suit investigation would be an additional step. It is one thing to allow stockholders who uncover wrongdoing in appraisal proceedings to use such information in parallel or later-filed actions, as was the case in *Cede*. It is another thing to permit stockholders full discovery in an appraisal proceeding where their goal is to investigate wrongdoing, which would stretch *Cede* beyond its facts.[74]

Moreover, the recent aim of Delaware lawmakers has been to restrict appraisal, not expand it. Appraisal litigation surged in the 2000s and early 2010s.[75] Some attribute this surge to the practice of "appraisal arbitrage," where institutional investors would invest in a target company after the announcement of a transaction because they calculated that their recovery in an appraisal proceeding would exceed a given merger.[76] Although scholars

---

[74] *See id.* at 1184 (noting that the petitioner invested *two years* into litigating its appraisal claim before using discovery adduced in the appraisal action to file its follow-on claim for breach of fiduciary duty).

[75] *See* Wei Jiang et al., *Appraisal: Shareholder Remedy or Litigation Arbitrage?*, 59 J.L. & ECON. 697, 704 (2016) (showing that 2–3 percent of all eligible deals between 2000 and 2002 attracted appraisal litigation versus 20–25 percent of all eligible deals between 2011 and 2014); Korsmo & Myers, *supra* note 64, at 294 (finding that the average number of appraisal filings from 2004 to 2010 was approximately nine per year while the average number from 2011 through 2014 was approximately 22 per year).

[76] *See* Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 WASH. U. L. REV. 1551, 1573–74 (2015).

demonstrated that appraisal arbitrage was a net benefit to the integrity of the M&A process and to stockholders,[77] Delaware lawmakers took steps to limit appraisal. In 2016, the General Assembly amended Section 262 in two ways to limit its attraction.[78] Meanwhile, a triplet of Delaware Supreme Court decisions issued from 2017 to 2019 emphasizing the significance of the deal price when calculating fair value further reduced the allure of appraisal claims.[79] While none of the recent developments in appraisal law speak to the precise issue raised by the parties, expanding appraisal litigation would certainly run contrary to the trend they reflect.

### 3. Crafting A Rule

Having canvassed the relevant developments in Section 220 and Section 262 cases, along with the policy justifications underlying those developments, this decision returns to the policy questions posed by Respondent.

---

[77] *See* Korsmo & Myers, *supra* note 64, at 279.

[78] *See* 8 *Del. C.* § 262(g) (eliminating appraisal rights for shares traded on a national securities exchange unless the shares entitled to appraisal exceed 1% of the class or series, the value of the merger consideration for those shares exceeds $1 million, or the merger was approved pursuant to 8 *Del. C.* § 253 or § 267); 8 *Del. C.* § 262(h) (allowing appraisal respondents to prepay an amount of their choosing to petitioners in order to avoid the accrual of pre-judgment interest on that amount).

[79] *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128 (Del. 2019); *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346 (Del. 2017); *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017); *see also* Wei Jiang et al., *The Long Rise and Quick Fall of Appraisal Arbitrage*, 100 B.U. L. REV. 2133, 2176 (2020) (finding that the principal reasons for a decline in appraisal arbitrage are the Delaware Supreme Court's decisions in *DFC, Dell,* and *Aruba*).

Should appraisal petitioners be permitted to obtain full discovery in an appraisal proceeding that has been commenced for the purpose of conducting a pre-suit investigation? In my view, no. While a trial court has broad discretion generally in establishing the scope of discovery, public policy militates against granting appraisal petitioners full discovery where the proceeding is an obvious replacement for an unavailable Section 220 action.

As discussed above, Delaware courts have been channeling would-be class action plaintiffs to Section 220 to conduct pre-suit investigations in connection with M&A litigation. Because the necessary-and-essential standard for obtaining books and records under Section 220 is narrower than the Rule 26 standard for obtaining discovery in appraisal proceedings, if permitted as a form of pre-suit investigation, appraisal proceedings could become viewed as a more attractive option than Section 220. Allowing broad discovery for the purpose of pre-suit investigation, therefore, seems destined to lead to an influx of appraisal petitions filed in lieu of Section 220 actions. Such a trend would run contrary to Delaware lawmakers' efforts to limit appraisal litigation. Such a trend would also undermine the work that this court has done in refining Section 220 law. Moreover, the availability of Section 220 for the purpose of pre-suit investigations eliminates key policy concerns motivating the rule of *Cede*.

The above conclusion forces the next question: Should appraisal petitioners be permitted to obtain documents that they would have received in a Section 220 action where

24

they are foreclosed from pursuing a Section 220 action through no fault of their own? In my view, yes.

As discussed above, Section 220(c)'s stockholder-standing requirement and five-day rule render Section 220 an imperfect tool for investigating M&A transactions in the private company context. The policy concerns underlying *Cede*, however, are arguably more prominent in the private company context, where investors lack the benefit of federal disclosure laws and other regulations applicable to public companies. In that circumstance, it is still possible that "*only* shareholders pursuing discovery during an appraisal proceeding are likely to acquire the relevant information needed to pursue a fraud action if such information exists."[80]

Yet, where an appraisal proceeding is pursued because the Section 220 path is blocked, a trial court has discretion to limit discovery to the scope of what the petitioner could have obtained under Section 220. For reasons explained next, this is the appropriate outcome here.

### 4. Petitioners' Purpose

The analysis now returns to the question of Petitioners' purpose. If Petitioners are using this appraisal action as a substitute for Section 220, then they should only be able to obtain the types of materials that they could have obtained in a Section 220 proceeding. If Petitioners are using this appraisal action for other legitimate purposes, then the scope of discovery need not be so limited.

---

[80] *Cede*, 542 A.2d at 1189 (emphasis added).

The timing of this appraisal litigation strongly suggests that it is being pursued as an alternative to Section 220. Petitioners filed this action on December 7, 2020, and voluntarily dismissed the Section 220 Action three days later.[81] The notice of voluntary dismissal noted Petitioners' belief that, in this appraisal action, they "would be entitled, at a minimum, to discovery of the same material sought" in the Section 220 Action.[82]

Petitioners do not deny that pre-suit investigation is one of their aims. They simply claim that they also will pursue appraisal of their shares. The following objectively discernable facts reflect that this appraisal proceeding is an economically irrational investment for Petitioners if what they seek is the fair value of their shares.

- Petitioners seek appraisal of just 2,000 Company common shares, worth less than $2,000 at the merger price.

- Petitioners cannot meaningfully contest that the amount at issue in this appraisal proceeding is unlikely to exceed $20,000 and will only approach that amount if Petitioners win on most of the legal and factual issues.

- Petitioners cannot meaningfully dispute that their own costs in pursuing this litigation—filing fees, copying expenses, travel expenses, discovery expenses, and expert fees—would come close to or exceed $20,000.

The court has no reason to doubt Petitioners' counsel's representation that Petitioners will in fact seek appraisal of their shares and pursue this litigation to the fullest. Given the unusual facts of this case, however, the court cannot conclude that Petitioners would do so if appraisal proceedings lacked the benefit of access to full discovery.

---

[81] Section 220 Action, Dkt. 18.

[82] *Id.*

It is clear that Petitioners are pursuing the action as a substitute for Section 220. For that reason, Petitioners are entitled to no more information through discovery than what they would be entitled to through a Section 220 proceeding.[83]

## III. CONCLUSION

For the foregoing reasons, Respondent's motion for a protective order is granted in part. Given the novel nature of the issues presented, the parties did not focus their argument on whether Petitioners have already received the documents that they would have received in a Section 220 action. The parties shall confer on a schedule and manner of presenting that issue to the court.

---

[83] The risk of this holding is that it will inspire defense attorneys to engage in wasteful discovery and motion practice targeting appraisal petitioners' purposes. This should not be the takeaway. The facts of this case are unusual. The findings concerning Petitioners' purpose are based on clear, objectively discernable facts. It would be a mistake to conclude from this decision that it is open season on an appraisal petitioner's purposes.